**In re TUCKER FREIGHT LINES, INC., Debtor.**

**John R. WALHOUT, Trustee, Plaintiff,**

**v.**

**TFL, INC. and Central Transport, Inc., Defendants.**

**Bankruptcy No. HK 83–02391. Adv. No. 85–0767.**

United States Bankruptcy Court, W.D. Michigan.

Oct. 25, 1991.

David Murphy, Pepper, Hamilton & Scheetz, Detroit, Mich., for plaintiff.

Simpson Moran by Patrick A. Moran, Daniel F. Berry, Eric Parzianello, Birmingham, Mich., for defendants.

## OPINION ON REMAND FROM THE SIXTH CIRCUIT COURT OF APPEALS·

LAURENCE E. HOWARD, Bankruptcy Judge.

This dispute was originally before me on August 31, 1988 and September 1, 1988 for a two day trial to consider the breach of contract allegations raised by the Trustee, John Walhout, against the Defendants, TFL, Inc. and Central Transport, Inc. (hereinafter "Central Transport"). At the conclusion of the trial, I found in favor of the Plaintiff and awarded damages in the amount of $227,500.00. On April 15, 1991, the Sixth Circuit Court of Appeals reversed my decision in part and remanded the case to the Bankruptcy Court for the Western District of Michigan for further consideration of the purchase agreement entered into by the parties, 930 F.2d 24. After examining the transcript of the trial, the exhibits provided by each side, and the language of the purchase agreement, I conclude, for the reasons set forth in this opinion, that judgment should still be entered in favor of the Plaintiff in the amount of $227,500.00. Prejudgment interest is awarded from October 1, 1985 at the rate of 8% as allowed by Indiana law. Postjudgment interest will accrue at the rate set forth in 28 U.S.C. § 1961.

## FACTS

After submission by the parties of proposed findings of facts and conclusions of law and after reviewing the trial record, the Court finds the facts in this matter to be as follows.

On September 16, 1983, the Debtor, Tucker Freight Lines, Inc. (hereinafter "Tucker") filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Subsequent to the filing of its petition and until January 14, 1984, Tucker operated as debtor in possession. On January 14, 1984, Richard Remes was appointed Chapter 11 operating Trustee of Tucker. Later, on December 13, 1984, John Walhout replaced Mr. Remes as Trustee when the case converted to a Chapter 7 proceeding.

On April 27, 1984, I signed an order providing for the sale of all of the Debtor's rolling stock and other business assets. Disposition of the stock and assets was accomplished by an auction sale conducted from June 5th through June 8th of 1984 by Joyner Auctions, Inc. Among the items sold at the auction were Tucker's Indiana Operating Authority (the "Intrastate Authority") and its interstate operating authority.

Larry Mason, an officer of Central Transport, attended the auction and successfully bid for the Intrastate Authority at the amount of $310,000.00. On the same day as the sale, Mr. Mason executed a purchase agreement with the Trustee. The contract to purchase the Intrastate Authority was written by Mr. David Davidoff, attorney for the Trustee, Mr. Remes. This was the first time Mr. Davidoff drafted a contract for the transfer of an operating

authority in a trucking company. The contract called for an initial payment of 25% of the purchase price (here, $77,500), which was made. The purchase agreement also contained the provisions that are now before me for consideration.

After executing the contract for sale, an application to approve the transfer of the Intrastate Authority was prepared by the Trustee and Central Transport. This application was never filed. Central Transport, through advice of counsel, Alki Scopelitis, learned that it would be difficult, if not impossible, to effectuate a transfer of the Intrastate Authority as a result of trucking authorities already owned by Central Transport.[1] Ultimately, in an effort to avoid the problems with the transfer, Mr. Scopelitis, acting for Central Transport, formed and incorporated TFL, Inc. (hereinafter "TFL") under Indiana law, on June 18, 1984, as a wholly owned subsidiary of Central Transport. As a company, TFL possessed minimal assets and was formed solely as a vehicle for accomplishing the transfer of the Intrastate Authority.[2] In late June, 1984, Mr. Remes and TFL filed an Application to Transfer the Intrastate Authority to TFL. TFL was also substituted for Central Transport as transferee on the purchase agreement. Central Transport remained liable on the contract, however, and was not released from any duties under the contract by the substitution of TFL.[3]

Various protests and complaints were filed with the Public Service Commission of Indiana (hereinafter the "PSCI") with respect to TFL's application for transfer. On July 25, 1984, Overland Transportation System, Inc. filed a complaint against the transfer. Overnite Transportation Company filed a protest with the PSCI in early August, 1984 as did Turner Trucking Company. Lastly, Holland Motor Express, Inc. (hereinafter "Holland") submitted its protest on November 15, 1984. The objections filed against TFL's application raised issues of duplication, dormancy and common control. Duplication is the problem of two entities, under common control, having identical operating authorities. Common control results when a company is under the management or ownership of another entity. Dormancy exists when the purchased trucking authority was not exercised by the seller prior to acquisition. The problem of dormancy forces the buyer to treat the transfer of an authority as the creation of a new authority and, consequently, make a showing of public need.

The first hearing scheduled before the PSCI, after all protests were filed, was on December, 19, 1984. Prior to the hearing, both Overland and Overnite withdrew their objections to the transfer of the Intrastate Authority. Based on the withdrawals, a motion for continuance was filed by Mr. Scopelitis and the December hearing date was postponed until April 25, 1985. By that time, Holland was the only remaining disputant. A series of continuances followed which eventually postponed the hearing date to October 1, 1985. The hearing before the PSCI, set for April 25, 1985, was continued because one of TFL's witnesses was scheduled to appear before the Michigan Public Service Commission during late April. The April 25th hearing was resched-

---

1. Although not essential to our determination, it appears that Mr. Scopelitis represented at least the Defendants and perhaps the Trustee in accomplishing the transfer of the Intrastate Authority. Mr. Scopelitis was certainly the attorney responsible for pursuing approval of the transfer application before the Public Service Commission of Indiana. Mr. Scopelitis had extensive experience in his field, having practiced before the Interstate Commerce Commission for 20 years. On June 8, 1984, Mr. Scopelitis sent a letter to Ronald Lech, Executive Vice–President of Central Transport, outlining the problems that could occur in getting the transfer approved.

2. In a letter written on June 22, 1984, Mr. Scopelitis, the attorney and incorporator of TFL, informed James Payne and Ronald Lech, two officers of Central, that their approach toward getting the transfer approved needs to be carefully planned and executed in order to achieve success.

3. The Sixth Circuit affirmed the holding of my previous decision that Central Transport was still liable under the purchase agreement. The issue of whether Central Transport was relieved of liability by the substitution of TFL is not in dispute at this time.

uled for June 28, 1985, but was continued, again, to September 6, 1985 because the Trustee's witnesses were scheduled to appear before this Court. Finally, the September 6, 1985 hearing date was postponed to October 1, 1985 when the attorney for Holland was scheduled a be on a trip outside this country in early September.

Despite the hearing delays before the PSCI, TFL was operating under the Intrastate Authority. During the period from October, 1984 to October, 1985, TFL obtained and maintained temporary operating authority for the intrastate routes. This was accomplished through a series of requests for temporary authority that were regularly filed by TFL and that were always granted.

In response to the protests filed, Mr. Scopelitis and Central Transport developed an approach for accomplishing the transfer of the Intrastate Authority. It seems that through the advice and expertise of Mr. Scopelitis, Central Transport decided that the problems of dormancy and duplicate authority would lessen the longer TFL operated under temporary authority. Therefore, the Defendants orchestrated, or at least acquiesced in allowing, the hearing delays outlined above.

On September 7, 1984, Mr. Scopelitis wrote to James Payne, Senior Vice–President of Central Transport, explaining that his reason for not immediately addressing the objections filed to TFL's application was that "time was on our side." This statement can only be interpreted to mean that delay in the proceedings would make TFL's position stronger. In another letter dated September 10, 1984, Mr. Scopelitis reiterated the position that "time is on our side" and informed Mr. Payne that temporary operating authority was obtained through February 11, 1985. Just prior to

the December hearing date, Mr. Scopelitis again corresponded with Mr. Payne, this time informing the Central Transport executive that he had requested a continuance of the transfer hearing and would seek to get the hearing rescheduled "as late as possible in the spring of 1985."

Mr. Payne and Mr. Lech, both officers of Central Transport, stated at trial that they did not purposefully seek any delay of the proceedings and in fact did not know of any plan or strategy to do so.[4] Mr. Scopelitis testified, through the entry of his deposition, that no one party controlled the speed of the hearing and that he was never told to delay the application process. But, this testimony is contradicted by the correspondence already mentioned and by testimony of Mr. Scopelitis, given as follows, in explaining how the passage of time benefitted TFL's application before the PSCI:

> I think throughout this thing, and I feel compelled to put this on the record at this point, the longer we took in building up the traffic under TFL ... the better the chances we had of winning the case.... If we could show that TFL really operated separately from Central and that it was a separate entity operating in a separate fashion, then the Commission, we felt, wouldn't be as prone to impose restrictions.

Transcript Volume II at 169–70. Further testimony was given by Mr. Scopelitis regarding TFL's pursuit of the Intrastate Authority:

> Well, the theme that ran throughout my representation of the transaction is to build up the Tucker authority as much as possible so that it was capable of being sold, and the longer we would get under temporary authority, the more we would build up the traffic in that separate enti-

---

4. On direct examination of Mr. Payne by Mr. Murphy the following took place:

> Q It was part of the purchaser's strategy in this case to operate TFL or to allow TFL to operate using the Tucker authority on a temporary basis for as long as possible; is it true?
> A No.

Transcript Volume II at 73. In Mr. Berry's cross-examination of Mr. Lech, this testimony was elicited:

> Q Did you do anything to slow down the process of the application within the State of Indiana for the intrastate authority?
> A Absolutely not.
> Q Did you instruct anyone to do anything to slow down that process?
> A No.

Transcript Volume II at 236–37.

ty, thereby combating the issue of dormancy and combating the issue of duplication.

Transcript Volume II at 194.

In reviewing all the testimony given, I must conclude that soon after learning of the objections filed, Central Transport, TFL and Mr. Scopelitis decided that it was to their advantage to delay the proceedings. As I mentioned at trial, there was nothing sinister about this, but the record reflects that as part of their effort to obtain approval of the application, it was decided that it would be best to outlast the opposition and build up an operating record under the grant of temporary authority. Despite the comments of Mr. Payne and Mr. Lech to the contrary, I find that both knew of and approved of this approach. The correspondence between the parties reflects this conclusion, as does the testimony of Mr. Scopelitis, noting especially his continual use of the pronoun "we" in his testimony, cited above, when referring to the persons who decided to pursue and knew of the strategy of delay.

As already noted, the hearings before the Commission were delayed until, finally, October 1, 1985. TFL's application never came before the Commission, however. On September 30, 1985, Mr. Lech, as executive vice-president of Central Transport, invoked an option provided under paragraph 2(f) of the purchase agreement and withdrew its offer to purchase the Intrastate Authority. The transfer hearing before the PSCI was postponed until the end of the month, October 31, 1985.

In response to Central Transport's action, on October 21, 1985, the Trustee, by now Mr. Walhout, commenced this adversary proceeding on behalf of the estate in bankruptcy seeking injunctive relief and damages against the Defendants for breach of contract. Holland withdrew its objection to the application on October 30, 1985. Central Transport still maintained its right to withdraw from the purchase and the PSCI dismissed the transfer proceeding shortly thereafter, at the October 31, 1985 hearing. Pursuant to a court order, the Trustee resold the authority for $5000.00.

After a two day trial, I held for the Plaintiff, finding that Central Transport and TFL improperly withdrew from the purchase agreement and were still obligated to the Trustee for the purchase price of the Intrastate Authority. I further found that Central Transport was not relieved of liability under the contract. Damages were set at $227,500.00. The damage award was arrived at by taking the purchase price of $310,000.00, for which the Defendants were liable, and subtracting the $5000.00 gained by the Trustee upon resale, and subtracting the $77,500.00 initial payment made by the Defendants and retained by the Trustee.

The Defendants appealed my decision, eventually, to the Sixth Circuit Court of Appeals, who affirmed my decision as to Central Transport's liability under the agreement but remanded the case for consideration of whether the withdrawal was proper under paragraph 2(f) of the contract and for interpretation of other contract provisions. The Sixth Circuit stated that this Court should determine the following:

Is paragraph 5 a condition precedent to paragraph 2(f)? If so, was the condition met so that central had the right to exercise paragraph 2(f)? If Central had the right to exercise paragraph 2(f), what was the time in which it had to exercise its option under 2(f)? Did it exercise its option to complete the sale under that paragraph by continuing to seek approval of the transfer after February 5, 1985? If not, did Central's notice of termination on September 30, 1985 constitute notice within a reasonable time?

If paragraph 5 is not a condition precedent or was satisfied, so that Central had the right to exercise the options contained in paragraph 2(f), what was the time in which it had to exercise its option under 2(f)? Did it exercise the option to complete the sale by continuing to seek approval for the transfer after February 5, 1985? If not, did Central's notice of termination on September 30, 1985 constitute notice within a reasonable time?

*Walhout v. TFL, Inc. (In Re Tucker Freight Lines, Inc.)*, No. 90–1244, slip op. at 3–4 (6th cir. filed April 15, 1991 [930 F.2d 24 (table)]).

### ARGUMENT

On June 5, 1984, at the conclusion of the bidding for Tucker's Intrastate Authority, Mr. Mason, acting for Central Transport, signed a contract to purchase the Intrastate Authority which contained the following provisions:

2. ...

(f) If the transfer of this Authority cannot be completed within eight (8) months from the date of this agreement, the Buyer has the option to complete the sale at a later date, or require that the payment described above be returned.

5. The Buyer agrees, at its expense, to diligently prosecute the application for the transfer of the Authority and will use its best efforts to secure such transfer.

It is these provisions of the purchase agreement that are again before me for interpretation. The eight month period in paragraph 2(f) expired on February 5, 1985. Central Transport withdrew from the agreement on September 30, 1985.

Central Transport's position is that after the eight month deadline, on February 5, 1985, it acquired the option right to dismiss the transfer proceeding and that its withdrawal on September 30, 1985 was pursuant to this valid right. Central Transport maintains that it diligently sought approval of the transfer application up to the date of withdrawal but that Holland's seeming intransigence caused it to lose hope and give up on seeking approval. Central Transport concludes that it reasonably and legally exercised its rights under paragraph 2(f). As to paragraph 5, Central Transport contends that it is not a condition precedent to the exercise of their option under paragraph 2(f), but that, in any event, Central Transport complied with paragraph 5.

The Trustee lists a variety of reasons for this Court to conclude that Central Transport was in breach of its obligations under the purchase agreement. The Trustee asserts that Central Transport, by its actions, elected under paragraph 2(f) to complete the sale and that, with this choice, lost the right to withdraw. Next, the Trustee argues that Central Transport had only a "reasonable time" after February 5, 1985 to exercise its option and that Central Transport failed to act within such a time period. With respect to paragraph 5, the Trustee maintains that regardless of whether it was a condition precedent, Central Transport breached its best effort requirement and has such should be denied the opportunity to exercise its option under paragraph 2(f). Lastly, the Trustee argues that either waiver, estoppel or laches preclude Central Transport from exercising any right under paragraph 2(f).

Initially, it is evident that the parties did not think very carefully about paragraph 2(f) until late September, 1985. As already noted, Mr. Davidoff, who drafted the contract, did not have much experience in the sale or transfer of authority. Mr. Lech testified at trial that he thought the provision unusual, that he didn't know about it at the time of signing and that he would have gone ahead with the sale without it being in the contract.[5] Mr. Scopelitis did not even read the contract until after the transfer proceedings were well underway. Because the Defendants were uncertain as to the existence and meaning of paragraph 2(f) and Mr. Davidoff inexperienced in drafting such agreements, it is hard for me to discern a great intent behind the inclusion of the option provision in the contract to purchase the Intrastate Authority. However, parties are bound by what they sign and a right exists under paragraph 2(f) that must now be construed.

---

**5.** Transcript Volume II at 207–10. What is apparent from this portion of Mr. Lech's testimony is that he really didn't know about the option expressed in paragraph 2(f) at the outset of the transfer proceedings. Even after he became aware of it, he still did not understand it to be a provision granting Central a beneficial option to withdraw and expressed that he disliked it being in the contract. Mr. Lech believed it to be a two-way option, initially. Transcript Volume II at 223.

DISCUSSION

## I. *Is Paragraph 5 A Condition Precedent To Paragraph 2(f)?*

■ "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." RESTATEMENT (SECOND) OF CONTRACTS § 224 (1982). "[C]onditions precedent are not favored and the courts will not construe stipulations to be such unless required to do so by plain, unambiguous language or by necessary implication." 17A AM.JUR.2d *Contracts* § 471 (1991).

Paragraph 5 of the purchase agreement requires Central Transport to diligently prosecute the application for the transfer of the Intrastate Authority and to use its best efforts to secure such transfer. The express language of paragraph 5 is not conditional. Rather, the mandate of paragraph 5 is in the form of a promise. Under paragraph 5, Central Transport agrees, unconditionally, to diligently prosecute the transfer application and to use its best effort toward successful procurement. No consequence or loss of any right under paragraph 2(f) is expressed for failure on the part of the Defendants to comply with paragraph 5. Since the language of paragraph 5 does not plainly and unambiguously declare it to be a condition, the law clearly favors construing this provision to be a promise. 5 Samuel Williston, *A Treatise on the Law of Contracts* § 665 (3d ed. 1961).

■ Conditions precedent must be stated explicitly. *Krukemeier v. Krukemeier Machine & Tool Co.*, 551 N.E.2d 885, 889 (Ind.App.Ct.1990). There is a complete absence of any language linking paragraph 5 with paragraph 2(f). Paragraph 5 makes no reference at all to paragraph 2(f). As a result, I find that paragraph 5 is an independent promise on the part of the Defendants.

Although perhaps not necessary for this determination as the express language of paragraph 5 makes clear that it is not a condition precedent, it is nonetheless helpful to note that the silence surrounding the inclusion of paragraph 5 in the contract to purchase favors it being viewed as an independent promise. From reviewing the testimony elicited, it is as if the parties gave no thought to paragraph 5. As already noted, Mr. Davidoff was unfamiliar with drafting such purchase agreements, and neither Mr. Lech nor Mr. Scopelitis seemed aware of the contractual provisions until after signing the agreement.[6] In light of the parties indifference to this part of the contract it would be inappropriate to construe paragraph 5 as a condition precedent to the option rights under paragraph 2(f).

■ Even with the conclusion that Paragraph 5 is not a condition precedent to Paragraph 2(f), the Plaintiff still maintains that the Defendants' failure to comply with paragraph 5 precludes them from exercising their option under paragraph 2(f). The Plaintiff argues that the Defendants breached their obligation to diligently pursue the transfer application and to use their best efforts. This first, material breach, claims the Plaintiff, prevents the Defendants from later exercising their right to withdraw from the purchase agreement. Plaintiff relies on the rule that a party in breach of contract cannot enforce contract rights, beneficial to him, against the non-breaching party. *See, Lawrence v. Caine*, 144 Ind.App. 210, 245 N.E.2d 663, 667 (1969).

I find that Plaintiff's claim is not factually supported. Under paragraph 5, the Defendants were required to use their best

---

**6.** I have already noted the testimony of Mr. Lech to the effect that he was not aware of the import of paragraph 2(f) until after substantial work had begun on securing approval of the transfer application. The deposition of Mr. Scopelitis, introduced at trial, also reveals that he was unfamiliar with the contract at the time of signing. In answering a question from Plaintiff's counsel Mr. Scopelitis stated:

I had never seen the contract, so I can't even begin to answer a question as to why or how, rather the contract became the subject of the application because I never saw the contract. When I filed the application, there was no nexus between the contract and the application in my mind because I never saw it.
Transcript Volume II at 143–44.

efforts to secure approval of the transfer application. A best effort requirement is not synonymous with successful completion. The Plaintiff argues that by withdrawing its application on the eve of the hearing, Central Transport breached its obligation under paragraph 5. This fact alone is not enough to conclude that Central Transport was in breach of its duties under paragraph 5. A valid exercise of its conditional option rights under paragraph 2(f) would not constitute a breach of paragraph 5. Even if Central Transport invalidly invoked the option under paragraph 2(f), that does not mean, necessarily, that the defendants failed to diligently pursue approval before the PSCI. Breach of contract could occur under paragraph 2(f) without the conclusion that the defendants failed to use their best efforts to secure the transfer of the Intrastate Authority.

There is no indication that Central did not pursue the approval of the transfer vigorously. The Defendants continued to seek and obtain grants of temporary authority, which improved the likelihood of success in obtaining permanent approval. Further, Mr. Scopelitis, the attorney pursuing approval before the PSCI, was in continual contact with the Defendants, updating them on the progress of the application, the chances of it being approved, and the means that should be adopted to ensure approval.

■ The fact that the hearing before the PSCI was delayed, even often, is not enough to determine that Central Transport neglected its duty. Delay, if excused, will not trigger the breach of a best effort provision. *Burras v. Canal Construction & Design Co.*, 470 N.E.2d 1362, 1367 (Ind. App.Ct.1984). From the peculiar nature of the application process in this case, it appears that the Defendants may have been vigorously pursuing approval of the transfer of the Intrastate Authority by allowing delay, and, perhaps, even intentionally causing it. The Senior Vice–President of Central, Mr. Payne, testified that the longer and more substantial the operations under temporary authority, the better the prospect of approval. Transcript Volume

II at 86. The dormancy and duplication objections raised by Holland would lessen in importance if TFL could continue in operation under temporary authority. As already explained, Mr. Scopelitis was aware of this fact when he wrote to the executives of Central Transport that "time was on our side." Rather than amounting to a breach of the best efforts requirement under paragraph 5, the numerous delays in the application process contributed to a greater likelihood of success.

I find that the Defendants did not breach their obligation under paragraph 5 to utilize their best efforts to obtain approval of the transfer. Rather, Defendants, in their knowledge of the transfer process, relied upon hearing delays to further the desired goal. In this way, their best effort was expressed by allowing TFL to build up its operation under temporary authority for the purpose of combatting the allegations of dormancy and duplication.

Paragraph 5 need no longer be considered. It is not a condition precedent to paragraph 2(f), and its best effort and due diligence requirements were not breached. My attention can now focus on paragraph 2(f) and the exercise by Central Transport of the conditional rights provided under it.

II. *What Is The Time Frame In Which The Defendants Could Exercise Their Option Under Paragraph 2(f)?*

Indiana law regarding contract construction is set forth in the case of *First Federal Savings Bank v. Key Markets, Inc.*, 559 N.E.2d 600 (Ind.1990). When the contract language can be clearly interpreted, without ambiguity, "[t]he proper posture for the Court is to find and enforce the contract as it is written and leave the parties where it finds them." *Id.* at 604. It is easily discernible from the language of the contract that Paragraph 2(f) is a condition subsequent granting the Defendants an option, upon its occurrence, to either proceed with the transfer application or elect to withdraw from the purchase agreement and obtain a refund of any funds tendered. The condition is triggered and the option right accrues when the transfer cannot be

completed within eight months. Two questions need to be considered in looking at paragraph 2(f). The first question is when Central Transport possessed the right to withdraw. Next, I need to consider how long Central Transport had to elect a course of conduct under the option.

■ As to the first question, this Court concludes that the option to proceed or to request the return of any payment made did not accrue until after February 5, 1985. Central's option did not arise until the eight month period, after the date of the agreement, passed. Paragraph 2(f) states that "if the transfer of this Authority cannot be completed within eight months" the buyer, here Central Transport, possesses the right to withdraw or to proceed. The word "cannot" means that certainty exists as to the conclusion that something is not possible. Here, certainty of the fact that the transfer will not complete within eight months exists only with the expiration of the time period. The Plaintiff argues that certainty, and therefore the conditional right under the contract, existed before February 5, 1985. This position does not reflect the clear language of the condition. The conclusion that it is not possible for the transfer to be completed within eight months does not arise without any doubt until the period has expired.

Finding that the option right under Paragraph 2(f) does not accrue until after February 5, 1985 also comports with sound contract interpretation. To rule in accordance with the Plaintiff's argument would force the Court to determine a date when the degree of certainty rose to such a level as to preclude the possibility that the transfer would still be accomplished within the eight month period. That would be a nebulous consideration, impossible of exact determination. It is only after February 5, 1985 when it can be concluded with total certainty that the transfer cannot be completed within the eight month period.

Further, my interpretation of when the option period begins enables a clear under standing between the parties to exist. Otherwise, the agreement would call for each party to independently balance degrees of certainty as to when the transfer could not be accomplished within eight months. Conflicting results would certainly occur and no one would know conclusively when the option right existed until the matter was brought before a court. Paragraph 2(f) should be interpreted to avoid the necessity of a litigious resolution as to when rights accrue and should be interpreted to promote a clear understanding between the parties that encourages like-mindedness. With that in mind, I find that the option right under paragraph 2(f) accrued only after February 5, 1985.

■ Next, I need to consider the length of the option period. Again, the *Key Markets* case controls my consideration. "It is the duty of the courts to interpret a contract so as to ascertain the intent of the parties." *First Federal Savings Bank v. Key Markets, Inc.*, 559 N.E.2d at 603. The agreement between the parties is silent as to the length of the option period. Paragraph 2(f) only grants the Defendants the choice to withdraw or to proceed. It does not set forth the time in which the Defendants must choose which course to follow. What is remarkable about this case is the absence of evidence as to the intent of the parties. The Defendants proceeded with the transfer seemingly unaware of the existence of Paragraph 2(f), while the Plaintiff's attorney, who wrote the agreement, professed an inexperience in drafting such contracts for the purchase of shipping authorities. There is an absence both in the agreement itself and in the trial record as to the duration of the Defendants' right. "Where there is no provision as to the time of performance, a reasonable time is implied." 17 AM.JUR.2d *Contracts* § 479 (1991). This result is accepted under Indiana law. *See, Grand Lodge Hall Ass'n, I.O.O.F. v. Moore*, 224 Ind. 575, 70 N.E.2d 19, 22 (1945). The briefs submitted by each party also reach this conclusion.[7] Based upon the concurrence of all these

---

7. Trial Brief of TFL, Inc. and Central Transport, Inc. at 11 provides that their option right pursuant to paragraph 2(f) existed for a reasonable period of time. Plaintiff's Trial Brief (On Remand) at 16 reaches the same conclusion.

sources, I can easily find that the Defendants possessed a reasonable amount of time after February 5, 1985 to decide whether to exercise their right to withdraw.

III. *Did Central's Notice Of Termination On September 30, 1985 Constitute Notice Within A Reasonable Time?*

■ What constitutes a reasonable amount of time depends on "the subject matter of the contract, the situation of the parties and the circumstances attending performance." *Jay Clutter Custom Digging v. English,* 181 Ind.App. 603, 393 N.E.2d 230, 232 (1979).

Applying the facts of this dispute to the considerations outlined in the case just cited, it must be concluded that Central Transport did not provide notice of its intent to withdraw within a reasonable time after February 5, 1985. Rather than give an exact date as to when notice should have been given, I find that from the facts and circumstances of this case, the Defendants did not act within a reasonable time period. *See, FOP Lodge No. 52 v. Civil City,* 551 N.E.2d 469, 472 (Ind.App.Ct. 1990). By waiting until September 30, 1985, on the eve of hearing before the PSCI, Central Transport failed to exercise their right under paragraph 2(f) within the reasonable time period provided to them.

The contract entered into by the parties for the sale of the Intrastate Authority did not establish a time period in which the Defendants could exercise their option right. I have found that a reasonable time period should be imputed to paragraph 2(f)'s provision. Now, I hold that this Court should adopt a conservative approach in determining what constitutes a reasonable amount of time.

As I have noted earlier, the parties gave little thought to the written document embodying the sale accomplished at the auction. The purchase agreement was signed shortly after the auction at the insistence of the Trustee. There was no negotiation behind the drafting of paragraph 2(f). The Defendants were so familiar with the transfer process that they proceeded with their application before the PSCI without much thought about the purchase agreement. Central Transport's executive Vice-President, Mr. Ronald Lech, testified that he did not know of the existence of the option provision at the time the contract was signed or shortly thereafter. Further, Mr. Lech testified that he did not request the inclusion of that provision, and that he found it unusual and would have gone ahead with the sale without it. Central Transport was initially skeptical about paragraph 2(f) as they thought the withdrawal right could be exercised by either party. These facts and circumstances compel a restricted interpretation of the length of the reasonable period that Central Transport had to act. With neither party placing emphasis on paragraph 2's inclusion in the purchase agreement, it would be inappropriate to allow the Defendants to have an expanded right to walk away from the agreement long after the signing and even long after the eight month period expired.

The Defendants argue that, through a more expansive reading of paragraph 2(f), their withdrawal on September 30, 1985 came within a reasonable time after February 5, 1985. Central Transport bases its contention on the rule that an agreement and its provisions should be construed against the drafter. *Wabash Ford Truck Sales, Inc. v. Ford Motor Company,* 472 N.E.2d 611, 614 (Ind.App.Ct.1984). Despite this rule, I cannot find that it was reasonable under paragraph 2(f) for Central Transport to persevere with its application past February 5, 1985, through numerous delays, and then, nearly eight months later exercise a right to withdraw that neither side ever considered very important or gave much thought to.

The purpose of the agreement was to reduce to writing the results of the auction sale. The sale was the result of a court order allowing the liquidation of the Debtor's assets. A lingering right to renounce their purchase at the auction could not have been in the minds of the parties. Central Transport was experienced in the pur-

chase and transfer of intrastate authorities. The Trustee's position was to secure the maximum benefit for the Bankruptcy Estate. Both desired at the outset to expeditiously accomplish approval of the transfer by the PSCI.[8]

The option allowed the Defendants to pursue the transfer for eight months and then consider their chances for success. The Defendants had the right, at the end of the eight month period, to assess the situation. If the prospect of approval was slim, fraught with objections, and would be drawn out, the Defendants were given the right to withdraw. But, if after eight months, the Defendants found that approval could be obtained with continued effort, then they could elect to proceed with the application before the PSCI. The Defendants possessed a beneficial option that would allow them to withdraw if the transfer process became inexpedient. Even though beneficial to the Defendants, the option cannot be viewed as allowing the Defendants to drag out their consideration of which path to elect, and then abandon their purchase at a later date forcing the estate to absorb the cost of resale and possible losses. Rather, the option period should last for a length of time appropriate for the Defendants to determine whether continued pursuit or withdrawal is more appropriate. The option under paragraph 2(f) needed to last for a reasonable time to enable the Defendants to evaluate and determine which course to follow. Under paragraph 2(f), reasonable time means time sufficient to determine which option right to exercise; withdrawal from the agreement because continued pursuit would be fruitless, or completion of the transfer process.

Central Transport was experienced in the transfer process. The reasonable time necessary for them to determine whether to withdraw from the purchase agreement would not be long. Within a short period of time after February 5, 1985 Central Transport should have been able to assess the prospects for successful completion of the application before the PSCI. Much of the correspondence between attorney Alki Scopelitis and the officers of Central Transport concerned predictions about the likelihood of approval. Central Transport did not need to wait through numerous delays, until the eve of a hearing that finally appeared ready to take place, to conclude that it should abandon its offer to purchase the Intrastate Authority.

Since February 5, 1985 only one objection to transfer existed. No new ones arrived to complicate consideration. Central Transport knew of the objection to dormancy and duplicity and knew how best to combat it. Central Transport did not need a long period after February 5, 1985 to consider and plan. The letters of Alki Scopelitis reflect that their approach to obtaining approval was established and their awareness of the obstacles to transfer complete. The amount of time Central waited to withdraw was not reasonable in light of the decision that the option entitled them to make. Central Transport needed only to decide which was the more expedient course. Central Transport had all the facts before them on February 5, 1985 and should have been able to arrive at a choice before late September, 1985.

In construing Paragraph 2(f), I must arrive at an understanding of what constitutes a reasonable time for the Defendants to exercise their option to withdraw that harmonizes all the provisions of the purchase agreement. *First Federal Savings Bank v. Key Markets, Inc.*, 559 N.E.2d at 604. Paragraph 2(f) does not purport to endow the Defendants with the ability to postpone exercising their option right until they are sure which course of action would be better. It does not enable the Defendants to wait until the eve of the hearing and only then conclude that obtaining approval is without hope and walk away from its agreement. While I have found that Central diligently pursued its transfer application, a time came when it had committed itself to benefitting from the delay in the hearing process as part of its effort to

---

**8.** Transcript Volume II at 237. Here, Mr. Lech testifies about the strength of his commitment

to accomplishing the transfer of the Intrastate Authority successfully and without delay.

secure approval, and where it would be unreasonable to allow the Defendants to utilize an option, given only little consideration in the drafting and signing of the purchase agreement, to withdraw from its obligation.

By not exercising their option right within a reasonable time, the Defendants were in breach of contract when they attempted to withdraw from the purchase agreement. This being so, I concur with the result I reached at trial back in 1988.

IV. *Did The Defendants Exercise Their Option To Complete The Sale At a Later Date By Continuing To Seek Approval For The Transfer After February 5, 1985?*

Once the February 5, 1985 deadline passed, Paragraph 2(f) provided the Defendants with an option to proceed with the transfer application or withdraw from the process. By electing one course of action, the Defendants are precluded from exercising the alternative right at a later date. The Defendants could not elect under paragraph 2(f) to "complete the sale at a later date" and then withdraw from its offer. Two, inconsistent, rights are provided by paragraph 2(f). The Defendants could elect to complete the sale or to withdraw. By electing to complete the sale, Central Transport becomes committed to securing approval of the transfer to the exclusion of their right to withdraw. Paragraph 2(f) cannot be understood to mean that the Defendants' election under paragraph 2(f) does not become binding until completion actually occurs. By electing the right to continue, the Defendants necessarily surrender the other, inconsistent, right to withdraw. 5 Samuel Williston, *A Treatise on the Law of Contracts* § 683 (3d ed. 1961). Here, by their conduct, I find the Defendants elected to continue to seek approval of the transfer and therefore surrendered any right under Paragraph 2(f) to withdraw from the purchase agreement.

The conclusion that Central Transport, by its conduct, elected to pursue completion of the transfer process must be based on actions occurring after the February 5, 1985 deadline, for it is only after that date that the Defendants possessed a right to exercise. Ample evidence exists before February to indicate that the Defendants had decided on a strategy of delay and were committed to seeking approval even after February 5, 1985. On December 14, 1984, Mr. Scopelitis, who was representing the Defendants, wrote to the Senior Vice-President, Mr. Payne, informing him that he would try to get the hearing on approval set for as late as possible in the spring of 1985. This date would have been beyond the February 5, 1985 deadline.

But, the affirmative and exclusive election under Paragraph 2(f) could not be made until after the Defendants possessed the option right. Evidence does exists that even after February 5, 1985, Central Transport was committed to securing approval of the Intrastate Authority before the PSCI. On June 26, 1985, Mr. Scopelitis, in another letter to Mr. Payne, this time in the "P.S." to his correspondence, commented on how best to handle the remaining objection of Holland and remarked that "we can keep this matter going for quite a long time, as we already have." The testimony of the parties reflect and the facts are conclusive that even after the eight month deadline, Central Transport remained committed to securing approval before the PSCI by waiting out the remaining disputant. This conduct amounts to an election under Paragraph 2(f) to continue pursuing approval to the exclusion of their right to withdraw. Mr. Scopelitis believed that successful transfer could be achieved and acted in accordance with this belief after the eight month deadline expired. The conduct of the Defendants and of Mr. Scopelitis reflect that they were not retaining the right to withdraw at a later date, but were committing themselves to seek approval of the transfer application.

Based upon these facts, I find that the Defendants exercised their option under Paragraph 2(f) to seek approval of the transfer application and as such were precluded from exercising the right to withdraw. The Defendants were in breach of contract by their actions in late September, 1985. Damages should be and are awarded

in the amount of $227,500.00 as decided at trial in 1988.

With this decided, it is not necessary to consider the other grounds for relief, namely waiver, estoppel and laches, argued by the Plaintiff. Such equitable remedies are not required when the result is clear at law and from contract interpretation. It should suffice to reiterate that I had found that the Defendants voluntarily waived their right to withdraw under Paragraph 2(f) at the previous trial, but that the Sixth Circuit remanded this case for consideration of the issues of contract interpretation.

### V. Prejudgment Interest

■ In the case of *Scrima v. Insurance Company of North America (In re Scrima)*, 119 B.R. 539 (Bankr.W.D.Mich.1990), I held that the award of prejudgment interest is a matter controlled by state substantive law when the bankruptcy court is called upon to determine a state law cause of action. This decision was grounded upon the Sixth Circuit's decision in *American Andoco, Inc. v. Reynolds Metal Co.*, 743 F.2d 417 (6th Cir.1984) where the court stated that "[i]n diversity cases, federal courts follow state law on the question of prejudgment interest." *Id.* at 425. The Trustee brought his action against the Defendants alleging, essentially, breach of contract and demanding legal and equitable remedies. In deciding this adversary proceeding, I have been guided solely by Indiana law. With this in mind, I now hold that prejudgment interest is available to the Plaintiff from October 1, 1985 at the rate of eight percent (8%) in accordance with Ind.Code Ann. 24–4.6–1–103 (Burns 1991). The award of prejudgment interest serves to fully compensate the Plaintiff for the damage caused by the Defendants' actions. Post-judgment interest is awarded from the date of judgment as provided by 28 U.S.C. § 1961. The Federal rate for post-judgment interest is now at 5.42%.

### VI. Attorney Fees

Finally, the Plaintiff requests that I award attorney fees to them in the final computation of damages. Paragraph Six of the purchase agreement provides that:

> Buyer shall pay all attorney's fees and expenses in connection with the filing and prosecution of a Petition for Exemption or application for the approval of the transfer of the Authority contemplated by this agreement.

■ Attorney fees are provided in only two specific situations under the language quoted above. First, paragraph 6 requires the buyer to pay all attorney fees in connection with the filing and prosecution for a petition for exemption. Next, the buyer must cover all attorney fees in connection with the application for the approval of the transfer of the authority. Obviously, this case does not concern a petition for exemption. Further, it would be an unwarranted stretch to conclude that attorney fees, arising from this litigation, were contemplated in the provision for attorney fees in connection with the approval of a transfer application. The dispute before me is an action for breach of the entire purchase agreement. Paragraph six must be limited to expenses arising directly from the process of seeking approval before the PSCI. This breach of contract suit arises only indirectly from the application for the approval of the transfer. The contract to purchase the Intrastate Authority does not expressly provide for the award of attorney fees to the Plaintiff in this instance and as such I now deny the Plaintiff's request for them.

■ Generally, courts disfavor awarding attorney fees. "The rule here has long been that attorney's fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717, 87 S.Ct. 1404, 1406, 18 L.Ed.2d 475 (1966). This rule coupled with the language of the purchase agreement lead to the conclusion that the Plaintiff is not entitled to the award of attorney fees.

### CONCLUSION

This Court now finds that Central Transport improperly invoked the right to with-

draw expressed in paragraph 2(f) of the purchase agreement. Central Transport failed to exercise its right within a reasonable time, and was further precluded from withdrawing as they had already, by their conduct, elected to complete the transfer of the Intrastate Authority. The Trustee is entitled to judgment against the Defendants with damages awarded at $227,-500.00 plus prejudgment interest as provided by Indiana law and post-judgment interest under 28 U.S.C. § 1961. The Trustee is denied attorney fees.