**FIRST FEDERAL SAVINGS BANK OF INDIANA, Appellant (Defendant),**

v.

**KEY MARKETS, INC., an Indiana Corporation, Appellee (Plaintiff).**

**No. 45S03–9009–CV–590.**

Supreme Court of Indiana.

Sept. 10, 1990.

---

1.  *See* J. Goldstein, A. Freud & A. Solnit, *Beyond* the *Best Interests of the Child* (2d ed. 1979).

R. Brian Woodward, Anderson & Tauber, P.C., Merrillville, Stephen E. Smith, Siemon, Larsen & Purdy, Chicago, Ill., for appellant.

Nick Katich, Lucas, Holcomb & Medrea, Merrillville, for appellee.

CIVIL PETITION TO TRANSFER

PIVARNIK, Justice.

This cause comes to us on a petition to transfer from the Third District Court of Appeals. Petition is brought by Defendant–Appellant First Federal Savings Bank of Indiana.

The action arises from development of real estate known as Sheffield Commons Shopping Center, located in Dyer, Indiana. Development plans for Sheffield Commons began in 1975 by Joseph McLoughlin, who later sold a one acre tract of land to Trust No. 3375 for the purpose of adding as part of the shopping center a grocery supermarket to be operated by Burger's Supermarkets, Inc. This one-acre tract did not contain sufficient parking space and access, so McLoughlin agreed to lease additional land in Sheffield Commons to Burger's for this purpose but was not willing to surrender his control of this additional land. One of the provisions of the parking lot lease at issue in this cause is Section 10.01(a) which is as follows: "Except for an assignment to a 'Corporate Affiliate' of Tenant, Tenant shall not assign this lease or sublet all or a portion of the demised premises without the consent of Landlord."

Subsequently, Burger's and McLoughlin entered into a common area easement agreement in order to provide for a fully integrated shopping center and parking lot. Burger's thereafter constructed the supermarket and parking lot while McLoughlin constructed the remainder of the shopping center. The supermarket in Sheffield Commons was opened in 1977.

The business enterprise of Sheffield Commons did not go well in the ten years, more or less, before the present parties acquired their interests. Defendant–Appellant First Federal Savings Bank of Indiana succeeded to the interest of McLoughlin through foreclosure proceedings; Key Markets represents one of a number of parties succeeding to Burger's interest in the supermarket property and the parking lot lease. In each of the several assignments from Burger's to succeeding parties, consent of McLoughlin was sought and given pursuant to the contract. Key Markets succeeded to Burger's interest in January, 1985. In October, 1985, First Federal succeeded to the interest of McLoughlin in the entire shopping center by way of mortgage foreclosure.

In the fall of 1987, Key Markets entered into negotiations with Babincsak Enterprises, Inc., who proposed to obtain Key Markets' interest for Certified Grocers, Inc., who would, in turn, sublet the supermarket and parking lot to Babincsak. Key Markets sent a letter to First Federal requesting its consent to assign the parking lot lease and common area easement agreement to Certified Grocers, Inc. First Federal refused to consent.

There was some evidence that there were negotiations between First Federal and Certified Grocers to purchase the entire mall although testimony as to these negotiations seemed to be much in conflict. At any rate, negotiations between First Federal and Key Markets for the proposed assignment failed, and on December 11, 1987, First Federal notified Key Markets by letter that it was cancelling the parking lot lease by reason of the proposed assignment, relying on Article X, Section 10.01(b) of said lease. Before Key Markets received this notice, it had vacated the supermarket premises in accordance with its agreement with Babincsak. The closing of Key Markets' sale to Babincsak was scheduled for December 14 but never occurred because of First Federal's refusal to consent to the assignment of the parking lot lease.

On December 21, 1987, Key Markets filed a complaint in Lake Superior Court seeking declaratory and injunctive relief as well as damages stemming from First Federal's cancellation of the lease. The trial court conducted a hearing upon Key Markets' application for a preliminary injunction on January 5, 1988. At the conclusion thereof, the trial court granted Key Markets' motion to consolidate and advance the hearing on the merits for the issues of whether First Federal could unreasonably withhold consent to assignment and whether First Federal had the right to cancel the lease.

The trial court found First Federal had a legal duty not to unreasonably withhold consent to assignment and further had no right to cancel the lease. First Federal was permanently enjoined from enforcement of its cancellation of the lease on the sole motivation of a requested assignment in connection with the sale of business. The Court of Appeals affirmed the trial court in its application of the "reasonableness test" concerning the consent provision of the lease agreement even though the lease agreement did not require the landlord to be reasonable in refusing to consent to assignment of the leasehold interest. As the Court of Appeals stated:

> The trial court determined that consent may not be unreasonably withheld notwithstanding the absence of limiting language in the lease so requiring, thus engrafting on the end of this provision the phrase "which consent shall not be unreasonably withheld."

*First Federal Savings Bank of Indiana v. Key Markets, Inc.* (1988), Ind.App., 532 N.E.2d 18, 20. We hold the Court of Appeals applied improper standards in the construction of this contract and, accordingly, vacate the opinion of the Court of Appeals and reverse the trial court on this issue.

The Court of Appeals opted to follow the holding in *Fernandez v. Vasquez* (1981), Fla.Dist.Ct.App., 397 So.2d 1171. The Florida court in *Fernandez* opted to adopt what they called an emerging modern trend of contract construction which imposes rea-

sonableness of consent to assignment of a lease by the lessor even though such limiting language does not appear in the lease. The Florida court held:

> [A] lease is a contract and, as such, should be governed by the general contract principles of good faith and commercial reasonableness. One established contract principle is that a party's good faith cooperation is an implied condition precedent to performance of a contract. Where that cooperation is unreasonably withheld, the recalcitrant party is estopped from availing herself of her own wrongdoing.... [A] lessor may not arbitrarily refuse consent to an assignment of a commercial lease which provides, even without limiting language, that a lessee shall not assign or sublease the premises without the written consent of the lessor. A withholding of consent to assign a lease which fails the tests for good faith and commercial reasonableness, constitutes a breach of the lease agreement.

*Id.* at 1173–74.

These broad general statements of contract construction do not accurately describe the duties and responsibilities of courts in interpreting contracts, or they should at least be applied in very limited and specific instances where such a question of construction is apparent, particularly when one uses such expressions as "good faith cooperation," "recalcitrant party" and "wrongdoing."

First Federal contends, and all parties agree, including the Florida court in *Fernandez* and the Court of Appeals, that, under traditional common law principles, absent a recital in the lease that the lessor's consent could not be unreasonably withheld, the lessor was not required to pass the test of reasonableness and could refuse consent without any explanation. First Federal also correctly points out that this traditional common law view is still endorsed by a majority of jurisdictions, including Indiana. The seminal case addressing the corresponding rights, duties and obligations regarding assignments between landlords and tenants in the State of Indiana is *The Indianapolis Mfg. and Carpenters Union v. The Cleveland, C., C., & I. Ry.* (1873), 45 Ind. 281. This Court found in that case that in the absence of limiting language in the lease, the tenant has a right to assign or sublet freely. The Court found that to restrain the tenant's use under these circumstances from exercising his rights in the use of his leasehold interest would be in restraint of alienation. The Court further found, however, that a limiting assignment clause in the lease that gave the power to the lessor to accept or reject assignment was enforceable, since the purpose of the clause was to reserve to the lessor the unilateral right to say who would occupy the premises. The restraint of alienation concern would be resolved in such a case. *Id.* at 288–89. *See also, Pittsburgh, C., C., & St. L. R.R. v. Mexico Elevator and Live Stock Co.* (1925), 85 Ind.App. 42, 48, 149 N.E. 573, 575. Simply stated, if the lease contains no provision with reference to transfer or assignment of the leasehold interest, the lessee is in control, and if the lease contains the consent requirement the lessor is in control. Parties wishing to soften the effect of unilateral control of either party can cause to have engrafted on the consent provision "which consent shall not be unreasonably withheld." In such situations, standards have been provided to determine reasonableness pursuant to such provision when such an issue arises. *Fernandez*, 397 So.2d at 1174.

The law of contract construction by courts is well settled. It is the duty of courts to interpret a contract so as to ascertain the intent of the parties. It must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting. *R.R. Donnelley & Sons v. Henry–Williams, Inc.* (1981), Ind.App., 422 N.E.2d 353, 356. In interpreting a written contract the court will attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. *Shahan v. Brinegar* (1979), 181 Ind.App. 39, 45–46, 390 N.E.2d 1036, 1041; *Donnelley, supra; Evansville–Vander-*

*burgh School Corp. v. Moll* (1976), 264 Ind. 356, 362, 344 N.E.2d 831, 837. If the contract is ambiguous or uncertain in its terms and if the meaning of the contract is to be determined by extrinsic evidence, its construction is a matter for the factfinder. Rules of contract construction and extrinsic evidence may be employed in giving effect to the parties' reasonable expectations. If the ambiguity arises because of the language used in the contract and not because of extrinsic facts then its construction is purely a question of law to be determined by the trial court. *Donnelley, supra; Shahan, supra; Huntington Mutual Ins. Co. v. Walker* (1979), Ind.App., 392 N.E.2d 1182, 1184–85. When a court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made. There are, of course, equitable principles which might require the court to refuse to recognize the provisions of a contract where there is allegation and proof of fraud, misrepresentation, overreaching, undue influence, unjust enrichment or undue advantage of one party over the other. However, there is no allegation nor any evidence in this case claiming or showing these equitable defenses which would require consideration beyond the general rule stated above. The language in the lease was clear in its meaning, subject to but one interpretation, and was a provision well understood in the business community and commonly found in such leases. In fact, extrinsic evidence tended to show the parties purposely entered into this contract, having it provide as it did. McLoughlin required full control of the parking lot property in connection with the entire shopping center and the parties negotiated with that understanding.

While courts are bound to enforce contracts where intentions of the parties are clearly stated therein, a different problem arises where a contract is ambiguous or uncertain in its terms. In such a case the intent of the parties must be determined by extrinsic evidence or by examination of all of the provisions of the entire contract to attempt to harmonize all of those provisions so that consistency may be found in the ambiguous provision with all other provisions. It may well be that in limited and particular cases the court may be required to presume the parties were acting reasonably and in good faith to discern the intention of the parties and resolve the ambiguity or uncertainty. In other words, courts are bound to recognize and enforce contracts where the terms and the intentions of the parties can be readily determined from the language in the instrument. It is not the province of courts to require a party acting pursuant to such a contract to be "reasonable," "fair," or show "good faith" cooperation. Such an assessment would go beyond the bounds of judicial duty and responsibility. It would be impossible for parties to rely on the written expressions of their duties and responsibilities. Further, it would place the court at the negotiation table with the parties. In the instant case, the court would decide what is "fair" or "reasonable" concerning the advantage or disadvantage of control of the leased property. The proper posture for the court is to find and enforce the contract as it is written and leave the parties where it finds them. It is only where the intentions of the parties cannot be readily ascertained because of ambiguity or inconsistency in the terms of a contract or in relation to extrinsic evidence that a court may have to presume the parties were acting reasonably and in good faith in entering into the contract. This principle was well stated by our federal courts interpreting Indiana law in *Ford Motor Credit Co. v. Garner* (N.D.Ind. 1988), 688 F.Supp. 435; and *Morin Bldg. Products Co. v. Baystone Constr. Co.* (7th Cir.1983), 717 F.2d 413.

In *Ford Motor Credit*, Ford Motor Company sought to enforce a guaranty agreement made by Garner to Ford Motor Credit Company while operating a Ford dealership. Defenses were made similar to those raised by Key Markets in the instant case, asking the court to impose obligations of good faith and reasonableness in the performance and enforcement of the guaranty contract and relying on the Uniform Commercial Code and the Restatement of Con-

tracts as adopted in Indiana. District Judge Lee found that "[t]he duty of good faith supplied by Indiana's Uniform Commercial Code is specifically restricted to contracts 'within IC 26–1' and cannot be extended to cover the guaranty agreement in this case." 688 F.Supp. at 442. The court also found that the *Restatement (Second) of Contracts*, § 205 (1986), did not apply wherein it provided "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." The court first found this provision of the *Restatement* was not adopted by Indiana and further found its provisions applied to limited circumstances such as those involving insurance contracts and those involving a fiduciary relationship. More specifically, however, the court held this provision referred to cases where the court needed to make an interpretation of the intention of the parties or where the language used did not clearly express such intention. *Id.* at 443. Judge Lee stated:

> Realizing the problem posed by [*Prudential Ins. Co. of America v.*] *Crouch,* [ (S.D.Ind.1985), 606 F.Supp. 464] FMCC argues that *Crouch* is bad law, that no Indiana case has ever recognized a duty of good faith outside the realm of UCC or insurance law. The court was unable to find any Indiana case explicitly recognizing a duty of good faith in contracts generally and the case cited in *Crouch, Ang. v. Hospital Corp. of America,* 182 Ind.App. 381, 395 N.E.2d 441 (1979), does not rely upon the *Restatement (Second) of Contracts* or recognize a general duty of good faith implied in all contracts. Rather, it infers in the specific contract at issue, the contractual term of good faith, to give meaning to the intention of the parties. *Id.* 395 N.E.2d at 444. *See also Coleman v. Chapman,* 139 Ind.App. 385, 220 N.E.2d 285 (1966) (courts may infer terms to give meaning to the intention of the parties).

*Id.* at 442–43. Judge Lee found that the terms of the guaranty contract were clear and expressed the intentions of the parties so that no such inquiry was required. The court found that Indiana law does not impose a duty of good faith and fair dealing in the performance and enforcement of the guaranty contract by FMCC.

In *Morin Bldg. Products,* General Motors hired Baystone Construction, Inc. to build an addition to a Chevrolet plant in Muncie, Indiana. Baystone hired Morin Building Products Company to supply and erect the aluminum walls for the addition. The contract required that the exterior siding of the walls be of "aluminum type 3003, not less than eighteen B & S gauge, with a mill finish and stucco embossed surface texture to match finish and texture of existing metal siding." The contract also provided "that all work shall be done subject to the final approval of the Architect or Owner's authorized agent, and his decision in matters relating to artistic effect shall be final, if within the terms of the Contract Documents" and that "should any dispute arise as to the quality or fitness of materials or workmanship, the decision as to acceptability shall rest strictly with the Owner, based on the requirement that all work done or materials furnished shall be first class in every respect. What is usual or customary in erecting other buildings shall in no wise enter into any consideration or decision." 717 F.2d at 414.

Morin put up the walls, but, viewed in bright sunlight from an acute angle, the exterior siding did not give the impression of having a uniform finish and the General Motors representative rejected it. Baystone removed Morin's siding and hired another subcontractor to replace it. General Motors approved the replacement siding. Baystone refused to pay Morin the balance of the contract price ($23,000.00) and Morin brought suit for the balance. The jury found in favor of plaintiff Morin and Baystone appealed to the Seventh Circuit Court of Appeals. The issue on appeal was the correctness of a jury instruction which, after quoting the contractual provisions stated above, told the jury:

> Notwithstanding the apparent finality of the foregoing language, however, the general rule applying to satisfaction in the case of contracts for the construction of commercial buildings is that the satis-

faction must be determined by objective criteria. Under this standard, the question is not whether the owner was satisfied in fact, but whether the owner, as a reasonable person, should have been satisfied with the materials and workmanship in question.

*Id.*

In a well reasoned discussion concerning the difficulty of determining the intentions of the parties in providing that work must be done to the satisfaction of the owner, Judge Posner, writing for a unanimous majority, found that most jurisdictions, including Indiana, would hold that if "it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied, an interpretation is preferred under which the condition [that the obligor be satisfied with the obligee's performance] occurs if such a reasonable person in the position of the obligor would be satisfied." *Id.* at 415. He stated that even though this position appears to be paternalistic, the requirement of reasonableness is read into such a contract:

> not to protect the weaker party but to approximate what the parties would have expressly provided with respect to a contingency that they did not foresee if they had foreseen it. Therefore the requirement is not read into every contract, because it is not always a reliable guide to the parties' intentions. In particular, the presumption that the performing party would not have wanted to put himself at the mercy of the paying party's whim is overcome when the nature of the performance contracted for is such that there are no objective standards to guide the court. It cannot be assumed in such a case that the parties would have wanted a court to second guess the buyer's rejection. So, "the reasonable person standard is employed when the contract involves commercial quality, operative fitness, or mechanical utility which other knowledgeable persons can judge ... The standard of good faith is employed when the contract involves personal aesthetics or fancy."

*Id.* (citations omitted.)

The difficulty in the *Morin* case appeared in the evidence which showed that mill grade siding of the type used in this building has the character of variance in color from sheet to sheet, and within a single sheet, and is used in projects where aesthetics are not the primary concern, such as the factory building involved in *Morin.* The evidence indicated these variations are very slight, will commonly occur in the wall of any building using this grade material and would be expected to occur in the replacement wall as well as the wall supplied by Morin. The question was whether the parties intended to have a judgment made on the basis of these circumstances or whether the intent was to leave approval to the aesthetic whim of the owner. The district court was affirmed in the giving of the instruction and allowing the judgment to be made on the basis of reasonableness. In affirming the district court, however, Posner stated:

> Lest this conclusion be thought to strike at the foundations of freedom of contract, we repeat that if it appeared from the language or circumstances of the contract that the parties really intended General Motors to have the right to reject Morin's work for failure to satisfy the private aesthetic taste of General Motors' representative, the rejection would have been proper even if unreasonable. But the contract is ambiguous because of the qualifications with which the terms "artistic effect" and "decision as to acceptability" are hedged about, and the circumstances suggest that the parties probably did not intend to subject Morin's rights to aesthetic whim.

*Id.* at 417.

The parties in the instant case entered into a lease contract clear in its terms and well understood in the business community. Neither of the parties require "paternalistic protection" referred to by Judge Posner because they are experienced in business enterprises and fully understand the business. The trial court erred in applying improper standards in its interpretation of the contract.

The second issue presented in this transfer petition is a determination by the

trial court that First Federal was not entitled to cancel the parking lot lease pursuant to terms of the contract. The Court of Appeals affirmed the trial court on this issue, finding that the trial court correctly reached the conclusion that the involved ambiguity was latent thus opening the door for *parol* evidence upon which it based its judgment that it was not the intent of the parties that cancellation be an option in this instance. We find the Court of Appeals reached the correct decision on this issue and adopt their opinion on Issue II and make it a part of this opinion.

Transfer is granted, the Court of Appeals opinion is affirmed in part and vacated in part, and the trial court is directed to proceed with this cause consistent with this opinion.

SHEPARD, C.J., and DeBRULER and GIVAN, JJ., concur.

DICKSON, J., concurs in result without opinion.