**Edward W. ROTHE, Trustee of the Edward W. Rothe Employee Profit Sharing Trust, Plaintiff–Appellant,**

v.

**REVCO D.S., INC., Defendant–Appellee.**

No. 97–3606.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1998.

Decided June 3, 1998.

Rehearing and Suggestion for rehearing En Banc Denied July 31, 1998.

Edward W. Rothe, Chicago, IL, for Plaintiff–Appellant.

Terrence L. Brookie, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, for Defendant–Appellee.

Before CUDAHY, FLAUM, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Nineteen fifty-eight, with the possible exception of Uncle Sam's drafting of Elvis, was a tranquil and simple time. Consider, for example, baseball: no artificial turf, free agency, designated hitters, slick agents, .235hitting second basemen with multimillion-dollar guaranteed contracts, or domed stadiums, and all seven World Series games (pitting, as it also did in 1957, the New York Yankees against the Milwaukee Braves) played on natural grass under natural light. This case takes us back to that simple time for it was in 1958 that Obed and Mary Ellis leased a small property in Frankfort, Indiana (1990 population 14,754) to Hook Drugs, Inc. for·the operation of a drugstore. Today we consider what that old lease had to say, or perhaps more accurately not say, about the duty of the lessee to continue to operate the drugstore in the mid-1990's.

The 1958 lease, amended at times on points not material to this case, remained in effect well into the 1990's, although the original parties to it have departed the scene. In· 1960 the Ellises assigned their rights under the lease to an operation called Big Tranta, Inc. The present plaintiff, Edward W. Rothe, was the president and majority shareholder in Big Tranta when the assignment was made. Big Tranta assigned its rights to Rothe in 1996. Hook was acquired by another drugstore operator, the defendant Revco D.S., Inc., in July of 1994.[1] The lease was extended until 1999 pursuant to Hook's exercise of a 5–year renewal option in May of 1994.[2]

---

1. Revco's acquisition of Hook has precipitated other litigation in our court. See *Richter v. Hook–SupeRx, Inc.*, 142 F.3d 1024 (7th Cir. 1998).

2. A partial settlement of all disputes—but not the precise one in this case—was reached in 1997. The partial settlement terminated the lease.

The lease, as originally drafted by an attorney for Hook, provided that rent would be both fixed and a percentage of gross sales. Presently, the annual base rent is $15,000, a figure set in 1975. Between 1960 and 1974, the base rent was $11,500 per year. The percentage rate, unchanged since 1958, is 3 percent. That percentage was applied on gross sales exceeding $383,333 from 1958 to 1974 and on gross sales exceeding $500,000 since 1975. The lease, ever since 1958, is silent on the consequences to the tenant (other than to continue paying $15,000 in base rent each year) if the drugstore is not used or otherwise occupied. And that's the problem which precipitated this dispute, because Revco, apparently fearing an invasion by drugstore giant Walgreens, stopped using Rothe's property in December of 1995 and instead opened up a more modern operation (bigger store, drivethrough window, better parking, etc.) across the street. Rothe sued, claiming breach of contract, and the district court granted summary judgment for Revco. Today we consider Rothe's appeal of that decision.

The business of running a drugstore has changed since 1958. Today, the market seems to demand big, freestanding stores with lots of parking, front-end space for displaying merchandise, and even drivethrough window services. Apparently Hook was feeling a bit of a pinch because its Frankfort store was not up to industry standards by 1994. Nevertheless, the lease was renewed for five years at that time, and although Hook is off the hook for its obligations, everyone agrees that Revco, which stands in its shoes, is not. If the lease requires the continuous occupation and use of the drugstore, Revco must ante up considerably more than the $15,000 yearly base rent it presently pays.

The problem with Rothe's position is simple-there's nothing in the lease that expressly requires the lessee to continue to operate the store and thus generate sales that would increase the take for the lessor. The absence of such a clause is inexplicable, considering the importance (certainly by the 1990's) of the matter, particularly to the lessor. We say particularly to the lessor because as the years have passed, the rent based on gross sales has soared. When things were getting started, in 1960 for example, the percentage rent was only $1,312 per year, a scant 11 percent of the $11,500 base rent. In 1990, the percentage rent was $94,022, 86 percent of the total take to the landlord when added to the $15,000 base rent. Obviously, a matter as important as this should have been expressly reduced to writing, but perhaps no one thought about it—at least long ago—for as we said, 1958 was a simpler time.

So without an express condition obligating Revco to continue to operate the store, Rothe must, like all parties stuck with a bad contract, seek succor from a crutch—an implied covenant. In the district court, Judge Larry J. McKinney was unmoved by this claim. In a thorough review of Indiana law, which governs this diversity jurisdiction dispute, he concluded that the doctrine of implied promise could not come to Rothe's aid. We think, on our *de novo* review of that determination, that Judge McKinney was right on the mark.

Implied covenants in leases are not favored under the laws of most states, and Indiana is no exception. *Casa D'Angelo v. A & R Realty Co.*, 553 N.E.2d 515 (Ind.App. 1990). Revco argues here that the lease is unambiguous: no express requirement of continuous operation is stated so none should be implied. Rothe all but concedes the lease's lack of ambiguity but says that its "use" clause, in conjunction with other provisions, mandates a finding that an implied covenant to continue the drugstore operation is present.

Under Indiana law, courts must interpret the language of a contract "so as to ascertain the intent of the parties" and the clauses of the contract "so as to harmonize its provisions." *First Federal Savings Bank of Indiana v. Key Markets*, 559 N.E.2d 600, 603 (Ind.1990). If the contract is clear, however, courts must only require performance that is consistent with its terms. *Id.* at 604. It is only when a contract has ambiguous terms that a court may look to extrinsic evidence to find the intent of parties. *Id.* As the Indiana court appropriately cautions,

however, "parties to a contract have the right to define their mutual rights and obligations, and a court may not make a new contract or supply omitted terms while professing to construe the contract." *Johnson v. Sprague*, 614 N.E.2d 585, 588 (Ind.Ct.App.1993).

In circumstances similar to the situation in our case, the Indiana appellate court refused to imply a covenant to continue commercial operations once it found a lease to be unambiguous. *Keystone Square Shopping Center Co. v. Marsh Supermarkets, Inc.*, 459 N.E.2d 420, 423 (Ind.Ct.App.1984). Although the lease at issue in Keystone was a base and percentage lease, the leased premises were vacated for a time by a grocery store and reopened later as a smaller discount grocery store. In refusing to imply a covenant, the court emphasized that the parties had fairly equal bargaining power at the time of negotiations, neither party was a novice in the business, and the lease was a sophisticated document containing unambiguous language. Given the clear language of the negotiated contract, the court held that it would "not imply a covenant which would restrict one party's freedom to conduct its own business as it sees fit." *Id.* at 423.

In *Casa D'Angelo* the Indiana appellate court refused to imply a covenant to generate percentage rent but acknowledged that an implied covenant may be appropriate under certain circumstances. The restaurant in *Casa D'Angelo*, after months of declining business, closed its doors several months before its lease expired. The declining business was attributed to the owner opening up a similar restaurant in the area and decreasing the hours and services at the location in question. The landlord, A & R Realty Co., sought a finding of an implied covenant to generate percentage rent through the duration of the lease. The restaurant lease in *Casa D'Angelo* was similar to the drugstore lease we are reviewing. Its "use" clause required that the premises be used "for the operation of a restaurant facility and for no other purpose" without the written consent of the landlord. It also had a clause requiring the lessee to keep the restaurant open during "normal business hours." When A & R sued the lessee for breach of the "implied"

covenant, the Indiana appellate court declined to imply a covenant that had the effect of requiring the restaurant to continue operating and generating sales that would increase the rent.

Although A & R's request differed slightly from Rothe's claim, the two are fairly analogous. In its discussion, the *Casa D'Angelo* court stated that the use provision in the lease did not require the restaurant to operate on the premises; it merely prohibited the use of the premises for other purposes. As with the use provision in *Casa D'Angelo*, the clause in our case must be interpreted as merely prohibiting the uses specified in the lease. It does not require Revco to continue to occupy and use the premises as a drugstore.

 Simply put, an omitted contract term does not move Indiana courts to supply one. Rather, absent a structural necessity for the implied term, Indiana courts enforce the parties' agreement as written. The court of appeals' reasoning on this point in *Keystone Square* is supported by the Indiana Supreme Court's analysis in First Federal. It determined that inferring additional obligations (reasonableness in the case) into the parties' contract "does not accurately describe the duties and responsibilities of courts in interpreting contracts." 559 N.E.2d at 603. Rather, "[t]he proper posture for the court is to find and enforce the contract as it is written and leave the parties where it finds them." *Id.* at 604. It is only where the intentions of the parties cannot be readily ascertained because of ambiguity, or inconsistency in a term, that a court may have to find implied covenants to make the contract meaningful or consistent. A contrary position "would go beyond the bounds of judicial duty and responsibility" and would make it "impossible for parties to rely on the written expressions of their duties and responsibilities. Further, it would place the court at the negotiation table with the parties." *Id.* Therefore, where a court can consistently and unambiguously apply the par-

ties' agreement, Indiana law requires that it do so.[3]

This lease in this case, although perhaps originally involving Hook and an unsophisticated party (we say "perhaps" because it's possible, of course, that Obed and Mary Ellis were business sharks), became a lease with Big Tranta, a real estate development corporation, back in 1960. The landlord-lessor had many opportunities to seek to make the rent obligation provisions of the lease more precise. But that wasn't done. We can't rewrite the agreement to make it better for the landlord because, as things turned out, he's left holding a lease that isn't as tight as it should be.

AFFIRMED.

---

3. Rothe contends that First Federal only pertains to implied-in-law covenants, while his argument is that there was an implied-in-fact covenant here. But even if that were true, under the analysis of implied-in-fact covenants in *Casa D'Angelo*, Rothe's case fails. The lease was executed in 1958, when the drugstore was a new venture. In general, there is no implied duty to operate in leases for new ventures. See *Casa D'Angelo*, 553 N.E.2d at 522. Although an implied duty might exist in the exceptional case of a new venture where it was clear that the landlord was relying on percentage rent from the outset, Rothe does not, and could not, maintain that such an exception applies here.