

# IN THE
# Court of Appeals of Indiana

In the Matter of the Estate of Beverly K. Webster, Deceased, Christopher D. Webster,

*Appellant*



**FILED**

Jan 29 2026, 9:00 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Fred William Webster, and Christina Kay Webster, Individually and in the capacity of Co-Personal Representative of the Estate of Beverly K. Webster, and Katie Doades, Individually and in the capacity of Co-Personal Representative of the Estate of Beverly K. Webster,

*Appellees*

January 29, 2026

Court of Appeals Case No.
24A-ES-2788

Appeal from the Daviess Circuit Court

The Honorable Gregory A. Smith, Judge

**Opinion by Judge Brown**
Judges Felix and Scheele concur.

**Brown, Judge.**

[1] Christopher D. Webster ("Chris") appeals the trial court's orders dated April 16, 2024, October 17, 2024, and February 7, 2025.  We affirm.

## Facts and Procedural History

[2] On September 10, 2019, Beverly Kay Webster ("Beverly") executed a Last Will and Testament ("Beverly's Will") in which she bequeathed certain real property to various individuals including her granddaughter Katie E. Doades ("Katie"), her stepson Fred William Webster ("Bill"), her daughter Christina Kay Webster ("Christina"), and her grandson William Corbin Glen Webster ("Corbin"). Specifically, Beverly bequeathed 12.28 acres to Katie, 39.51 acres to Bill and Christina, and certain acres to Corbin.[1]  She also bequeathed a miniature horsedrawn wagon to her stepson Chris and directed that her remaining personal effects and other tangible personal property be sold and that the net

---

[1] With respect to the property bequeathed to Corbin, the Last Will and Testament references "25.86 Acres, more or less (14.60) Acres from DR.135, Pg. 363 & 11.20 Acres from DR. 144, Pg. 582."  Appellant's Appendix Volume II at 79.

proceeds of the sale be distributed to Chris if he is living at the time of her death.[2] Beverly appointed Christina and Katie as Co-Personal Representatives.

[3] After Beverly's death, Christina and Katie filed a Petition for Probate of Will and Issuance of Letters Testamentary and for Unsupervised Administration in the Daviess Circuit Court on April 22, 2022, under cause number 14C01-2204-EU-29 ("Cause No. 29"). On April 25, 2022, the trial court entered an Order Probating Will, Appointing Co-Personal Representatives, and Ordering Unsupervised Administration.

[4] On June 14, 2022, Mary Wancura ("Mary"), Ryan Webster, Bill, Christina Madil Webster ("Madil"), and Chris filed a Verified Will Contest Complaint under cause number 14C01-2206-PL-389 ("Cause No. 389"). In June 2022, Chris and Bill filed a Joint Renewed Motion to Revoke Unsupervised Administration Due to Formal Filing of Will Contest in Cause No. 29. That same month, the trial court in Cause No. 29 entered an order granting the motion and ordering that the unsupervised Estate be converted to a supervised Estate under cause number 14C01-2206-ES-47 ("Cause No. 47").

[5] On May 2, 2023, Mary, Bill, Madil, and Chris filed an Amended Verified Complaint under Cause No. 389 for: (1) Will Contests; (2) Tortious

---

[2] In his brief, Chris asserts that Beverly "modified her will in 2019 to remove any devise of property to" him. Appellant's Brief at 21 (citing Appellant's Appendix Volume II at 76). In his brief, Bill asserts that Chris erroneously states that he was disinherited. Indeed, Beverly's Will to which Chris cites indicates that Beverly bequeathed certain property to Chris.

Interference with Inheritances; and (3) Breaches of Fiduciary Duty.[3] On May 26, 2023, Chris and Bill filed a Petition to Remove Both Co-Personal Representatives under Cause No. 47. In June 2023, the court entered an Order for Mediation which listed Cause Nos. 47 and 389.

[6] On September 21, 2023, Chris and Bill entered into a Mediated Settlement Agreement (the "Agreement") with Christina and Katie. The Agreement referenced Cause No. 389 and Ind. Code § 29-1-9-1, *et seq.*, and stated that "[t]he Parties desire to resolve the claims asserted by Plaintiffs against Defendants and all other claims between them, whether or not currently asserted . . . and to provide for the final resolution and distribution of the Estate and Will Contest." Appellant's Appendix Volume II at 134. It further provided:

> 3. **Effective Date**. This Agreement shall be effective on the date when (a) the Probate Court has entered an order (or orders) approving this Agreement in its entirety; and (b) all Additional Parties have executed this Agreement (the "**Effective Date**").
>
> 4. **Costs of Administration**.
>
> a. In final satisfaction of all fees incurred through September 21, 2023, the Estate shall pay $80,000 to counsel for Christina and Katie and $50,000 to counsel for Chris and Bill. These payments will be funded first from the cash presently on hand in the Estate (approximately $46,000), with the remaining fees under this paragraph 4.a to be paid by Chris, Bill, and Christina equally.

---

[3] In January 2023, the court entered a Joint Stipulation and Order of Dismissal Regarding Only Plaintiff, Ryan William Michael Webster in Cause No. 389.

b. Additional attorney fees and expenses incurred by counsel for Christina and Katie shall not exceed $3,000 to finalize administration of the Estate, and Chris, Bill, and Christina shall pay such additional fees equally.

* * * * *

5. **Real Estate**. The Estate shall distribute all real estate to Chris and Bill as equal tenants in common, or among Chris, Bill, and Corbin as the three of them separately decide. Christina and Katie shall vacate the real estate within 45 days after the Effective Date. During this period, Christina and Katie shall maintain the real estate at status quo. Chris and Bill shall be permitted to inspect the real estate on September 22. The Parties shall cooperate in the transfer of utilities, insurance, and any other items reasonably necessary to facilitate the transfer of the real estate contemplated by this paragraph 5. Christina and Katie warrant that they have not caused any liens to attach to any or all of the real estate during their tenure as Co-Personal Representatives of the Estate. Christina and Katie shall not take any action to voluntarily report to IDEM, EPA, or any governmental authorities anything regarding the current or previous nature of any or all of the real estate, unless required by applicable law or court order.

6. **Payment to Christina and Katie**. Chris and Bill shall pay the total amount of $322,000 (the "**Settlement Sum**") to Christina and Katie to be divided among them as they separately decide. On or before ten days after the Effective Date: (a) Chris and Bill shall pay $32,200 of the Settlement Sum to Christina and Katie; (b) Chris and Bill shall execute a [sic] two promissory notes: one to Christina in the amount of $173,880 and another to Katie in the amount of $115,920, with each promissory note to be paid in thirty-six monthly installments together with interest at the short-term applicable federal rate for October 2023 of 5.22% *per annum*; (c) Chris and Bill shall execute and deliver to Christina and Katie a first priority mortgage in 32.035 acres of the real estate. The promissory notes and mortgage contemplated by this paragraph 6

shall be upon commercially reasonable terms and the initial drafts shall be prepared by counsel for Christina and Katie. Christina and Katie shall not take any action to voluntarily report to credit bureaus the indebtedness contemplated by this paragraph 6, unless required by applicable law or court order.

\* \* \* \* \*

8. **Dismissals**. On or before fifteen business days after the Effective Date, the Parties shall prepare and file a stipulation of dismissal, with prejudice, of the Will Contest as well as dismissals or withdrawals of any other pending matters in the Estate. Counsel for Chris and Bill will draft and file the documents required under this paragraph 8.

\* \* \* \* \*

20. **Attorneys' Fees**. If any of the Parties or any of the Additional Parties to this Agreement is required to initiate legal action to enforce the terms of this settlement, the prevailing party(ies) shall be entitled to recover their reasonable attorney's fees from the non-prevailing party(ies).

\* \* \* \* \*

22. **Entire Agreement**. This Agreement comprises the entire agreement among the Parties and Additional Parties. No statements, other statements or promises, verbal, written or otherwise, except as set forth herein, shall be used to construe this Agreement. No modification or amendment hereof shall be effective unless in writing and signed by each of the Parties and the Additional Parties hereto. The recitals set forth hereinabove are hereby incorporated and made a part of this Agreement.

\* \* \* \* \*

27. **Headings**. The headings in this Agreement are intended solely for the convenience of reference and shall be given no effect in the construction or interpretation hereof.

*Id.* at 135-140.

On September 25, 2023, Mary, Madil, and Corbin each signed a Consent to Approval of Settlement Agreement and Joinder, which stated:

> Each of the undersigned Additional Parties hereby (a) consents to the approval of this Agreement by the Probate Court, (b) joins and shall be bound by the mutual releases provided in paragraph 10 of this Agreement, and (c) joins and shall be bound by the provisions of paragraphs 8-9, 11-13, and 15-28 of this Agreement. Corbin further joins and agrees to be bound by the provisions of paragraph 6 of this Agreement.

*Id.* at 145.

On September 28, 2023, Chris and Bill filed a Petition to Accept and Approve Settlement Agreement in Cause No. 47. On October 2, 2023, the court in Cause No. 47 entered an order granting the petition which stated that the Agreement "is hereby ACCEPTED and APPROVED in its entirety by this Court." *Id.* at 146.

On October 17, 2023, Bill filed a Motion for Clarification and Limited Objection to Proffered Settlement Documents and asserted that he had made certain payments to Christina and Katie and Chris had failed to make the required payments under the Agreement. Bill asked for a "hearing to determine the proper acreage split" and "to find Chris in default." *Id.* at 155. On October

18, 2023, Christina and Katie filed a Motion to Enforce Settlement Agreement in Cause No. 47.

[10] On November 1, 2023, Chris and Bill filed a Joint Prosecution Agreement for the Benefit of Third-Party Beneficiary Corbin under Cause No. 389, which had been signed by Chris and Bill and dated June 16, 2022, and that asserted that, "[u]nder Article VI of the purported Last Will and Testament of Beverly K. Webster . . . . [Corbin] is granted a specific bequest of real estate in the approximate amount of 25.86 acres"; "[u]nder the purported will, Bill also receives a specific bequest of a one-half (1/2) interest in real estate under Article V . . . [b]ut Chris receives no real estate under the purported will"; and "[u]nder the true, correct, and valid Last Will of Beverly K. Webster, both Chris and Bill receive substantial real estate under specific bequests, but [Corbin] receives no real estate, meaning [Corbin] does not receive [Corbin's] real estate under the true, correct, and valid Last Will of Beverly K. Webster." Appellant's Appendix Volume III at 189. The Joint Prosecution Agreement provided that Chris and Bill would not use the litigation "as a means to intentionally dispossess [Corbin] from (or prevent the possession of) [Corbin's] real estate." *Id.* It further provided that, "[i]n the event the parties are the prevailing parties in the Will Contest, they shall and must convey [Corbin's] real estate to [Corbin] as soon as practically possible" and Corbin was a "third-party beneficiary to this Agreement with all the rights to enforce the same as if he were a primary party to this Agreement." *Id.* at 190. In December 2023, the Personal Representatives recorded a deed relating to the transfer of "25.86

Acres, more or less (14.60) Acres from DR.135, Pg.363 & 11.20 Acres from DR.144, Pg. 582" to Corbin. Exhibits Volume III at 8.

[11] On January 9, 2024, Chris filed a Petition for the Removal of Personal Representatives in Cause No. 47 and argued that "[i]nstead of distributing the real estate to [him], the Personal Representatives executed and delivered to [Corbin] a deed to 25.86 acres of the Estate's real estate, one-half of which was supposed to be distributed to [him]." Appellant's Appendix Volume II at 210.

[12] On February 8, 2024, the court held a hearing. On April 16, 2024, the trial court entered an eleven-page order under Cause Nos. 389 and 47, which entered judgment against Chris on all of his claims. It found that the four corners of the Agreement "show the only real estate referred to was what the Co-Personal Representatives (Christina and Katie) were devised which was described as 32.035 acres" and "[t]he 32.035 acres represents a key detail" in the Agreement. *Id.* at 58. It further found that the Agreement "does not set aside the 2019 Will or invalidate the Will's specific devise or bequests to" Bill or Corbin. *Id.* It found that Chris had not made any payments under the Agreement and Bill had made every required payment. It found that "[i]n October 2023, represented by counsel, Chris signed the promissory notes and mortgages referenced in the Agreement and returned them to opposing counsel, but then instructed opposing counsel . . . to wait on the mortgage recording." *Id.* at 59. It found that "the plain language of the Agreement lays out two (2) possible methods for the distribution of real estate; (1) that the Estate shall be distributed to Chris and Bill as equal tenants in common OR (2) among Chris,

Bill, and Corbin as the three of them **separately** decide" and "[t]he operative language is 'as **Chris, Bill, and Corbin separately decide**.'" *Id.* at 60. It found that "Bill should have the deed to the 32.035 acres issued to him in his sole name or as he shall designate. Bill is not required to transfer or devise any of the 32.035 acres to Chris, unless he chooses to do so upon payment in full from Chris." *Id.* The court found that Chris was in default under multiple provisions of the Agreement. It also found that "Chris is in breach of the Agreement whether the same is deemed clear and unambiguous and the Court looks only to the four corners of the Agreement or if the Court were to find it ambiguous and then look to extrinsic evidence to interpret the Agreement." *Id.* at 64.

[13] After several filings and a hearing, the court entered an order on October 17, 2024, which found that the Estate's assets had been administered and distributed and that the Estate "having been fully administered may now be closed." *Id.* at 67. On December 10, 2024, the trial court held a hearing. On February 7, 2025, the trial court entered an order which concluded that the attorney fees incurred were caused by Chris's breach of the Agreement and awarded Bill attorney fees in the amount of $49,415.74.

## Discussion

[14] Chris argues that the Agreement required "all real estate in the Estate's possession to be distributed to [him] and Bill as equal tenants in common unless [he], Bill, and Corbin could agree on how to allocate the property amongst themselves." Appellant's Brief at 33. He asserts that the Adjudicated Compromise and Controversies Act requires that the Agreement dictates

distributions from the Estate and the trial court's conclusion that the Agreement does not invalidate Beverly's Will conflicts with the Act. He contends that the trial court's reliance on the Joint Prosecution Agreement was improper because the Agreement contained a strict integration clause. He argues that, even if the Joint Prosecution Agreement had an impact, it did not require that property had to be distributed directly from the Estate to Corbin. Chris also argues that he did not breach the Agreement by failing to contribute to the down payment because the Agreement "simply made [him] and Bill jointly liable for the down payment, without specifying what contribution, if any, each individual was to make." *Id.* at 52. He asserts that, even if he breached the attorney fee provision, "the Personal Representatives' own breach of the [Agreement] by failing to distribute real estate owed to [him] would have required the trial court to have determined who breached the [Agreement] first." *Id.* at 54. Chris argues the attorney fee award to Bill should be reversed because the trial court's decision regarding his breach of the Agreement was erroneous.

[15] "The Compromise Chapter of our Probate Code provides a method by which interested parties may compromise certain contests or controversies about a will, estate, or testamentary trust." *Matter of Supervised Estate of Kent*, 99 N.E.3d 634, 637 (Ind. 2018). Ind. Code § 29-1-9-1 provides for the "compromise of any contest or controversy as to" the "admission to probate of any instrument offered as the last will of any decedent," "the construction, validity or effect of any such instrument," and "the rights or interests in the estate of the decedent of any person, whether claiming under a will or as heir." Ind. Code § 29-1-9-2

provides that "[t]he terms of the compromise shall be set forth in an agreement in writing which shall be executed by all competent persons having interests or claims which will or may be affected by the compromise" and that "[a]ny interested person may then submit the agreement to the court for its approval and for the purpose of directing the agreement's execution by the personal representative of the estate . . . ."

[16] Ind. Code § 29-1-9-3 "sets out the authority of the trial court when approving such a settlement agreement." *In re Estate of Yeley*, 959 N.E.2d 888, 893 (Ind. Ct. App. 2011), *trans. denied*. It provides that "the court shall, if it finds that the contest or controversy is in good faith and that the effect of the agreement upon the interests of persons represented by fiduciaries is just and reasonable, make an order approving the agreement and directing the fiduciaries and guardians ad litem to execute such agreement" and, "[u]pon the making of such order and the execution of the agreement, all further disposition of the estate shall be in accordance with the terms of the agreement." Ind. Code § 29-1-9-3.

[17] "A court order approving a settlement agreement is not an adjudication of the issues of the litigation, but rather is an avoidance of adjudication." *In re Yeley*, 959 N.E.2d at 893 (citing *In re Estate of McNicholas*, 580 N.E.2d 978, 982 (Ind. Ct. App. 1991), *trans. denied*). "It is clear that there is no provision in the compromise statute authorizing a trial court to rule upon the merits of a contest or controversy or to invalidate a will." *Id.* (quoting *In re McNicholas*, 580 N.E.2d at 982). The probate court may only (1) determine whether there is a good faith controversy and whether the effect of the agreement is just and

reasonable; (2) approve the agreement; (3) order the fiduciaries and guardians ad litem to execute such agreement; and (4) order the property to be distributed to the parties according to the settlement agreement. *Id.* (citing Ind. Code § 29-1-9-3; *In re McNicholas*, 580 N.E.2d at 982).

[18] To the extent we must interpret the Agreement, interpretation of a settlement agreement presents a question of law and is reviewed *de novo*. *Bailey v. Mann*, 895 N.E.2d 1215, 1217 (Ind. 2008). Construction of settlement agreements is governed by contract law. *Ind. State Highway Comm'n v. Curtis*, 704 N.E.2d 1015, 1018 (Ind. 1998). If a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning. *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005). Courts should interpret a contract so as to harmonize its provisions, rather than place them in conflict. *Id.* at 252. When interpreting a contract, courts must look at the contract as a whole. *Id.*

[19] "The task is to determine and implement the parties' intent when they entered the contract." *Wohlt v. Wohlt*, 245 N.E.3d 611, 616 (Ind. 2024) (citing *Decker v. Star Fin. Grp., Inc.*, 204 N.E.3d 918, 920 (Ind. 2023)). "And to do that, courts start with the language of the parties' agreement." *Id.* (citing *Decker*, 204 N.E.3d at 920). "[T]he failure to define a contractual term does not necessarily make that term ambiguous, nor does a simple disagreement about the term's meaning." *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 578 (Ind. 2013) (citation omitted). A contract is not ambiguous simply because the parties disagree about the proper interpretation of its terms. *Wohlt*, 245 N.E.3d at 616 (citing *G&G Oil Co. of Ind., Inc. v. Cont'l W. Ins.*, 165 N.E.3d 82,

87 (Ind. 2021)).  Instead, for an ambiguity to exist, the contract must be subject to more than one reasonable interpretation.  *Id.*  We will not construe clear and unambiguous provisions, nor will we add provisions not agreed upon by the parties.  *Trs. of Ind. Univ. v. Cohen*, 910 N.E.2d 251, 257 (Ind. Ct. App. 2009).

[20] If the contract's terms are unambiguous, then they are conclusive of the parties' intent, and courts give the contract its plain meaning.  *Wohlt*, 245 N.E.3d at 616 (citing *Decker*, 204 N.E.3d at 920-921; *Ryan v. Ryan*, 972 N.E.2d 359, 364 (Ind. 2012)).  "Thus, when reviewing an unambiguous written contract, courts look only to that document, staying within its four corners."  *Id.* (citing *U.S. Automatic Sprinkler Corp. v. Erie Ins. Exch.*, 204 N.E.3d 215, 223 (Ind. 2023)).

[21] "[I]f a contract's terms are ambiguous, inconsistent, or uncertain, its interpretation is no longer a question of law but one of fact."  *Id.* (citing *First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600, 604 (Ind. 1990)).  In that case, the trier-of-fact must determine the facts required to construe the contract.  *Id.*  "And to do that, the factfinder must look outside the contract's four corners to parol (or extrinsic) evidence."  *Id.*

[22] On one hand, the Agreement stated that "[t]he Parties desire to resolve the claims asserted by Plaintiffs against Defendants and all other claims between them, whether or not currently asserted . . . and to provide for the final resolution and distribution of the Estate and Will Contest."  Appellant's Appendix Volume II at 134.  Paragraph 5 of the Agreement used broad language in describing the real estate.  Specifically, Paragraph 5 provided that

"[t]he Estate shall distribute *all real estate* to Chris and Bill as equal tenants in common, or among Chris, Bill, and Corbin as the three of them separately decide," and "Christina and Katie warrant that they have not caused any liens to attach to *any or all of the real estate . . . .*" *Id.* at 136 (emphases added). Paragraph 6 provided that "Chris and Bill shall execute and deliver to Christina and Katie a first priority mortgage in 32.035 acres *of the real estate.*" *Id.* (emphasis added). The emphasized language suggests that the 32.035 acres was a part of a larger portion of real estate. *See Wohlt*, 245 N.E.3d at 617-618 (observing that "[g]enerally, '[t]he term "all" means "the whole number or sum of,"'" (quoting *All*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/all [https://perma.cc/ZP5D-ET7T] (last visited Nov. 21, 2024); and holding that "[t]he fact that the parties forgot that 'all' the assets would include cryptocurrencies does not render the phrase 'all' susceptible to multiple meanings. The term therefore remains unambiguous.").

[23] On the other hand, the Agreement did not define "real estate." While it referenced Beverly's Will, the Agreement did not adopt any provision or definition specifying the particular real estate to which it applied,[4] and, as found by the trial court, the Agreement did not specify that it "set aside" the Will. Appellant's Appendix Volume II at 57. The four corners of the Agreement reference "all real estate" and "32.035 acres of the real estate." *Id.* at 136.

---

[4] Indeed, Chris acknowledges that the Agreement "does not incorporate any provision of the 2019 Will in relation to distribution of the real estate." Appellant's Reply Brief at 9.

Without a mention in the Agreement of any other specific real estate beyond the 32.035 acres, one reasonable interpretation is that the parties intended the reference of real estate in Paragraph 5 to encompass only the 32.035 acres referenced in Paragraph 6. We also note that, while Paragraphs 5 and 6 are separate paragraphs, the parties placed the paragraphs together and also specified that "[t]he headings in this Agreement are intended solely for the convenience of reference and shall be given no effect in the construction or interpretation hereof." *Id.* at 140. Such an approach could find the facts in *Wohlt* distinguishable. In *Wohlt*, the parties agreed in a property settlement in a dissolution that "Husband shall retain all assets of the business, except for . . . Wife's Mac computer and printer, iPhone, iPad and laptop," which she would retain, and the parties "both forgot" that the company they owned still owned cryptocurrencies. 245 N.E.3d at 613. The Court observed that, "[i]f the parties had wished to create a separate disposition scheme for property they had forgotten, they could have done so" and "[o]ne way would be to specifically identify in the agreement (or as an attachment to the agreement) all property they were dividing with a separate provision addressing any later-remembered property." *Id.* at 618. Unlike the property settlement discussed in *Wohlt*, the Agreement here used the phrase "all real estate" but also went on to specifically refer to only 32.035 acres.

[24] We conclude that the provisions are at least susceptible to more than one reasonable interpretation and the Agreement is ambiguous. In such a case, a trier-of-fact must look outside the contract's four corners to parol (or extrinsic)

evidence. *Id.* at 616. Beverly's Will bequeathed 12.28 acres to Katie and 39.51 acres to Bill and Christina. Christina's interest in the 39.51 acres amounts to approximately 19.755 acres. Adding the 12.28 acres bequeathed to Katie would amount to 32.035 acres, which is the amount mentioned in Paragraph 6 of the Agreement. Further, the Joint Prosecution Agreement filed by Chris and Bill, which was signed before the adoption of the Agreement and filed after the adoption, acknowledged Beverly's Will and its bequest of 25.86 acres to Corbin. In light of the parol evidence, we conclude that the trial court's interpretation of the Agreement was not in error.

[25] Because we conclude that the trial court's interpretation of the Agreement was not erroneous, we do not find Chris's arguments regarding breach or the award of attorney fees to be persuasive as they are based on his contention that the trial court relied upon an incorrect interpretation of the Agreement. With respect to Chris's argument that the trial court abused its discretion by rewriting the Agreement to remedy his alleged breach, we note that Paragraph 5 provided that "[t]he Estate shall distribute all real estate to Chris and Bill as equal tenants in common, *or among Chris, Bill, and Corbin as the three of them separately decide*." Appellant's Appendix Volume II at 136 (emphasis added). The trial court highlighted this language and found that "Bill should have the deed to the 32.035 acres issued to him in his sole name or as he shall designate. Bill is not required to transfer or devise any of the 32.035 acres to Chris, unless he chooses to do so upon payment in full from Chris." *Id.* at 60. We also note that the trial court found that Chris breached the Agreement in multiple ways. Specifically,

the trial court found that "Chris is in default under paragraph 4 of the Agreement as he has not paid his portion of any of the attorney fees due under the Agreement" and "Chris has failed to dismiss the Will Contest within fifteen (15) business days of the Effective Date as required by the Agreement." *Id.* at 62. The court also found that "Chris is in default under paragraph 6 of the Agreement as he has not paid his portion of payments due to Defendants / Personal Representatives under the Agreement." *Id.* Paragraph 6 of the Agreement provided that "[o]n or before ten days after the Effective Date: (a) Chris and Bill shall pay $32,200 of the Settlement Sum to Christina and Katie." *Id.* at 136. Pursuant to Paragraph 3 of the Agreement, the Effective Date occurred on October 2, 2023, when the trial court entered an order accepting and approving the Agreement. Thus, payment was required by October 12, 2023, ten days after the Effective Date. Bill complied by making payment, but Chris did not.[5] While their respective portions to be paid were not set forth in the Agreement, Chris did not make any payment. In light of the record, we cannot say reversal is warranted.

[26] For the foregoing reasons, we affirm the trial court.[6]

---

[5] In his October 17, 2023 Motion for Clarification and Limited Objection to Proffered Settlement Documents, Bill asserted that he had made certain payments to Christina and Katie and Chris had failed to make the required payments under the Agreement. Specifically, Bill asserted that "[o]n or before October 12th, 2023 and in accordance with Settlement, Bill paid [Christina and Katie] $32,000.00 in two equal checks and simultaneously executed draft mortgages in accordance with the Settlement Agreement." Appellant's Appendix Volume II at 153.

[6] In the conclusion section of his brief and without citation to authority or a developed argument, Bill requests that this Court award appellate attorney fees. We decline to do so.

Affirmed.

Felix, J., and Scheele, J., concur.

ATTORNEYS FOR APPELLANT

Adam R. Doerr
Kevin D. Koons
Kroger, Gardis & Regas, LLP
Indianapolis, Indiana

Lucas John Rowe
The Rowe Law Firm
Sullivan, Indiana


ATTORNEYS FOR APPELLEE FRED WILLIAM WEBSTER

Kathryn E. DeWeese
Ryan M. Heeb
Bunger & Robertson
Bloomington, Indiana