**CITY OF LAWRENCEBURG,**
Appellant–Defendant,

v.

**MILESTONE CONTRACTORS,**
**L.P., Appellee–Plaintiff.**

No. 15A01–0308–CV–313.

Court of Appeals of Indiana.

June 10, 2004.

---

Matthew P. Zerbe, Zerbe Law Office, Lawrenceburg, IN, Attorney for Appellant.

Robert J. Hoffman, Carmel and Stephen D. Lepage, Indianapolis, of Harrison & Moberly, LLP, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, City of Lawrenceburg (Lawrenceburg), appeals the trial court's award of summary judgment in favor of Appellee–Plaintiff, Milestone Contractors, L.P. (Milestone) with regards to its claim for additional compensation under a construction contract.

We affirm.

### ISSUE

Lawrenceburg raises one issues on appeal, which we restate as follows: Whether the trial court correctly interpreted the construction contract between the parties as a basis for its entry of summary judgment in favor of Milestone upon Milestone's claim for additional compensation, and the trial court's denial of Lawrenceburg's cross-motion for summary judgment advocating a different interpretation of the construction contract.

### FACTS AND PROCEDURAL HISTORY

On or about January 16, 2001, Lawrenceburg solicited and received lump sum bids for the construction of a railway bridge over Front Street in Lawrenceburg, Dearborn County, Indiana. Various contract documents for the project were prepared and assembled by either Lawrenceburg or its engineering consultant, Hrezo Engineering Co. (Hrezo), and made available to bidders. These documents included construction drawing plans, a project manual containing detailed specifications, and other written materials.

A substantial part of this project consisted of supplying and driving 44 steel HP 12x53 pilings to provide structural support for bridge abutments and piers. The specifications in the bid documents called for each of these pilings to be driven into the ground to whatever depth (tip elevation) was required to provide a load bearing capacity of at least 70 tons. Specifically, specification 02000, § 1.B, provides that:

> [p]iling: all bridge pile shall be HP 12x53 sections conforming to ASTM A–36 Specifications. Piling shall be driven to batter and location shown and *to the minimum bearing capacity as noted on the plans.* All pile[s] shall be dynamically monitored for bearing capacity as set fort[h] in the geotechnical investigation report by H.C. Nutting Co.

(Appellant's App. p. 80) (emphasis added). The notation on the plans S–8 and S–9 further detailed:

> [n]ote: All piles shall [be] HP 12x53 and shall be driven to a *minimum tip elevation of 34.0 ft and pile bearing capacity of 70 tons.*

(Appellant's App. pp. 86, 88) (emphasis added).

However, the geotechnical investigation report by H.C. Nutting (Nutting Report), referred to in the specifications and drawing note included within section 02010 of the project manual, described two different estimated pile tip elevations and pile lengths required to achieve the 70 ton bearing capacity. This difference in estimated pile tip elevations depended on whether or not a plug would form at the top of the piling as it was being installed: (1) tip elevation 34.0 feet with a plug forming, and (2) tip elevation minus 5 feet without a plug forming. (Appellant's App. pp. 23–4). The contract documents further contained a table of estimated quantities, prepared by Hrezo, for 11 different elements of work, including an estimated

quantity of 4,096 linear feet (LF) for the HP 12x53 piling work, which would translate to an average piling depth of about 93 feet.

On February 2, 2001, three days before bids were due, Lawrenceburg and Hrezo issued addendum # 2, which stated in pertinent part:

> [i]n the event that the specified pile tip elevation is reached and the adequate soil bearing capacity is not yet achieved, as witnessed by the project engineer and the geotechnical engineer, the contractor shall be paid for an additional HP 12x53 bearing pile required at a rate of $60 per lineal foot.

(Appellant's App. p. 83) (emphasis added).

On or about February 5, 2001, Milestone submitted a lump sum bid of $865,600.00 to perform the project in accordance with the provisions of the contract documents. Lawrenceburg accepted Milestone's bid and awarded it the contract for the construction of the Front Street bridge project. Following the award, on March 21, 2001, both parties entered into and executed a written contract.

During the performance of the work, Milestone drove a total of 4,561.72 LF of piling to achieve the specified 70 ton load bearing capacity for each of the 44 piles. Of this amount, 2,365.48 LF was driven to the 34.0 ft minimum pile tip elevation, and an additional 2,196.24 LF was driven below such 34.0 ft. pile tip elevation to an actual depth which achieved the specified 70 ton soil bearing capacity. Consequently, pursuant to addendum # 2, Milestone requested payment from Lawrenceburg in the amount of $131,774.40 for the 2,196.24 LF of additional piling driven below the 34.0 ft minimum pile tip elevation point. However, Lawrenceburg approved only $28,814.40 of Milestone's claim, stating that the minus 5 ft elevation, as specified

in the Nutting Report, should be used as the specified pile tip elevation.

On July 2, 2002, Milestone filed its Complaint against Lawrenceburg demanding payment of the remaining $102,960.00. Thereafter, on March 25, 2003, Milestone filed its Motion for Summary Judgment, accompanied by a designation of materials and brief in support of the motion. On April 28, 2003, Lawrenceburg responded by filing its Motion for Summary Judgment, designated materials and brief in opposition to Milestone's Motion and in support of Lawrenceburg's cross-motion for summary judgment. On May 28, 2003, Milestone filed a reply brief. On June 11, 2003, the trial court conducted a hearing on the cross motions for summary judgment. Subsequently, on July 7, 2003, the trial court granted Milestone's Motion for Summary Judgment, and denied Lawrenceburg's cross-motion.

Lawrenceburg now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Standard of Review

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *American Family Mut. Ins. Co. v. Hall*, 764 N.E.2d 780, 783 (Ind.Ct. App.2002) *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id.* In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id.* The

party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id.* Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *See Ayres v. Indian Heights Volunteer Fire Dep.'t, Inc.,* 493 N.E.2d 1229, 1234 (Ind.1986).

Generally, the construction of a written contract is a question of law for the trial court for which summary judgment is particularly appropriate. *Mid State Bank v. 84 Lumber Co.,* 629 N.E.2d 909, 914 (Ind.Ct.App.1994). However, if the terms of a written contract are ambiguous, it is the responsibility of the trier of fact to ascertain the facts necessary to construe the contract. *Id.* Consequently, when summary judgment is granted based upon the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or that the contract ambiguity, if one exists, can be resolved without the aid of a factual determination. *Id.*

Lawrenceburg now claims that the trial court erred in granting summary judgment to Milestone. Specifically, Lawrenceburg asserts that the specified pile tip elevation, mentioned in addendum # 2, does not refer to the minimum tip elevation of 34.0 ft. Rather, Lawrenceburg contends that the contract specifications call for 44 pilings and 4096 LF of steel. Therefore, Lawrenceburg maintains, that based on a simple mathematical formula, bidders knew that the pilings would be an average of 93.09 ft long and would reach an elevation of minus 5 ft. Conversely, Milestone asserts that, according to the rules of contract interpretation, the minimum tip elevation of 34.0 ft must be read as the specified pile tip elevation upon which the calculation for additional compensation under addendum # 2 should be based.

In ascertaining the contract's clarity, or lack thereof, we consider the whole document, not just the disputed language. *Robinson v. Century Personnel, Inc.,* 678 N.E.2d 1268, 1270 (Ind.Ct.App. 1997), *trans. denied.* Construction of contract language that would render any words, phrases, or terms ineffective or meaningless should be avoided. *See Indiana Gaming Co., L.P. v. Blevins,* 724 N.E.2d 274, 278 (Ind.Ct.App.2000), *trans. denied.* "Courts should presume that all provisions included in a contract are there for a purpose and, if possible, reconcile seemingly conflicting provisions to give effect to all provisions." *Id.* Furthermore, in its interpretation of the contract, the court should attempt to determine the parties' intent when entering a contract from their expressions within the four corners of the written instrument. *See Samar, Inc. v. Hofferth,* 726 N.E.2d 1286, 1290 (Ind.Ct.App.2000) *trans. denied.*

At the outset we note that both parties agree that the only issue to be decided is the meaning and proper legal construction of the words in addendum # 2, establishing the *specified pile tip elevation* as the boundary line between piling work covered by the lump sum contract amount and the additional depth of piling required to achieve the 70 ton load bearing capacity. Although Article I and Article V of the contract executed between Lawrenceburg and Milestone enumerate all the contractual documents, these materials are silent as to a definition of the specified pile tip elevation.[1]

---

1. Even though Article V of the contract specifies the order in which the contract documents govern the issues, none of the parties' briefs or appendices clarify which documents

Nevertheless, we agree with the trial court that the specified pile tip elevation refers to the minimum tip elevation of 34.0 ft. In particular, specification 02000, § 1.B, expressly states that the "[p]iling shall be driven to batter and location shown and *to the minimum bearing capacity as noted on the plans.*" (Appellant's App. p. 80) (emphasis added). Reviewing the plans provided to all bidders, we especially note the statement that "piles shall be driven to a *minimum tip elevation of 34.0 ft.* and pile bearing capacity of 70 tons." (Appellant's App. pp. 86, 88) (emphasis added). We interpret this to mean that if the 70 ton bearing capacity was not reached upon a tip elevation of 34 ft., Milestone would have to continue to drive the pilings until the required bearing capacity was attained. In order to correct inherent problems associated with requiring an all-inclusive lump sum pricing to cover unknown piling depths, addendum #2 further elaborated that if "the specified pile tip elevation is reached and the adequate soil bearing capacity is not yet achieved," Lawrenceburg shall make an additional payment of $60 per LF. (Appellant's App. p. 83)

Furthermore, our review of the contract documents discloses that the minimum tip elevation of 34.0 ft. is the only elevation figure included in these documents. Thus, since the word "specified" refers to an item previously mentioned, the *specified pile tip elevation* can mean nothing else than the *minimum tip elevation of 34 ft.*

Moreover, mindful that all provisions included in the contract are there for a purpose, we cannot but interpret this minimum tip elevation as being the specified tip elevation. *See Indiana Gaming Co.,* 724 N.E.2d at 278. If the specified tip

should be considered as part of the general conditions, special conditions, specifications, proposal, or instructions to bidders. There-

elevation would be based on using 4096 LF of steel for 44 pilings, as Lawrenceburg urges us to, then the inclusion of a minimum elevation of 34 ft would be meaningless and moot. *See id.*

Additionally, we find Lawrenceburg's reliance on the Nutting Report in an attempt to bolster its argument without merit. The Nutting Report states that in the event a plug forms at the tip of the piling as it is being installed, a tip elevation of 34.0 ft suffices. On the other hand, if no plug forms, a tip elevation of minus 5 ft is necessary. Nonetheless, our review reveals that the Nutting Report serves only a very limited function and should not be considered as a contract specification for the work performed:

> The [Nutting report] is prepared primarily to aid in the design of site work and structural foundations. Although the information in the report is expected to be sufficient for these purposes, *it is not intended to determine the cost of construction or to stand alone as a contract specification.*

(Appellant's App. p. 39) (emphasis added). Moreover, in explaining the different elevations, the Nutting Report made the following statement:

> [Discussing the 34 ft pile tip elevation] Research and pile load tests suggest that when driving H-piles into dense to very dense sands, that the soil tends to wedge between the flanges of the H-section, and a "plug" forms. The entire "enclosed box" of the H-section end area is used to compute bearing capacity. Using this method, the H-pile will achieve capacity at a higher elevation. *It is our opinion that this case is representative of the project site.*

fore, we cannot review this issue with regards to the governing order of the numerous documents.

[Discussing the minus 5 ft pile tip elevation] We have also shown the estimated tip elevation, assuming a "plug" does not form at the bottom of the cross-sectional area of the H-pile. In this case, the "actual" end area of the pile is used to computed theoretical capacity and pile tip elevation. This analysis indicates that the pile would be driven significantly deeper to achieve capacity. *We do not believe that this is the case which will develop.* However, we have had a past project where the "plug" did not develop, and the piles were driven significantly deeper. *This analysis has been performed for reference.*

(Appellant's App. p. 38) (emphasis added). Thus, the Nutting report expressly endorsed the 34.0 ft tip elevation as the piling depth considered to be the most representative of the project site.

Therefore, based on all the contract documents before us, we conclude that the contract language was clear and unambiguous. *See Mid State Bank,* 629 N.E.2d at 914. A close reading of the contract supports Milestone's position that the specified tip elevation refers to the minimum tip elevation of 34.0 ft as included in the drawings.

■ Regardless of this reading of the contract documents, Lawrenceburg next contends that Milestone assumed the risk of an improper interpretation of the contract. In support of its assertion, Lawrenceburg points to the following clause included in the project manual:

If any person contemplating submitting a bid for the proposed contract is in doubt as to the true meaning of any part of the plans, specifications, or other proposed contract documents, he may submit to the ENGINEER a written request for any interpretation thereof. The person submitting this request will be responsible for prompt delivery.

Any interpretation of the proposed documents will be made only by addendum duly issued and a copy of such addendum will be mailed or delivered to each person receiving a set of such documents. The OWNER will not be responsible for any other explanation or interpretations of the proposed documents..

(Appellant's App. p. 84). Although courts in Indiana recognize exculpatory clauses in contracts and presume that the contracts present the freely bargained agreement of the parties, we find the clause to be inapplicable to the situation at hand. *See, e.g., Crowe v. Boofter,* 790 N.E.2d 608, 611 (Ind. Ct.App.2003).

Todd Fawver, estimating manager of Milestone's Indiana area office, testified in his affidavit that:

In the process of studying and comparing [a]ddendum [#] 2 and comparing same with the "minimum tip elevation of 34.0 ft" specified by the [n]otes on [d]rawings S–8 and S–9, Milestone concluded that its lump sum bid should include only the length of piling needed to reach the specified 34.0 ft minimum tip elevation depth for each pile, and that any additional length of piling required to be driven deeper to reach a 70 ton load bearing capacity was to be paid by the $60 per foot unit price in accordance with [a]ddendum [#]2.

(Appellant's App. p. 31). Accordingly, no doubt existed as to the true meaning of any part of the plans, specifications, or other proposed contract documents. Moreover, *assuming arguendo,* that a bidder might have had any remaining doubts, the exculpatory clause is permissive only, not mandatory in nature.

Therefore, in light of the clear and unambiguous language of the contract documents, we find that there is no genuine

issue of material fact. *See American Family Mut. Ins. Co.*, 764 N.E.2d at 783. We thus affirm the trial court's grant of summary judgment in favor of Milestone.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly granted summary judgment in favor of Milestone.

Affirmed.

BAILEY, J., concurs.

DARDEN, J., dissents with opinion.

DARDEN, Judge, dissenting.

I respectfully dissent.

As the majority acknowledges, the Nutting Report was referred to in the specifications and drawing note cited, as well as being included in the project manual. The Report indicates both (1) a possible 34 foot "estimated tip elevation" with a plug forming, which would be at an estimated 51 foot pile length; and (2) a "–5" estimated tip elevation, with "the pile . . . driven significantly deeper to achieve capacity" and an estimated 91 foot pile length. (App.38). The specifications then required that piling (1) be "driven to batter and location shown and to the minimum bearing capacity as noted in the plans," referencing the Nutting Report; and (2) "be driven to a minimum tip elev. of 34.0 ft. and pile bearing capacity of 70 tons." (App.80, 86).

The contract called for the installation of 44 pilings. On the drawing note, the estimated quantity of 12x53 steel piling to be installed was 4,096 linear feet. Thus, the estimated *average* piling length was 93 feet.

As argued by Milestone, it "and other bidding contractors" faced the "predicament" of being required to submit a lump sum bid for either the "worst-case" scenario—using a bid based upon the maximum

estimated length—or the risk of guessing what "the actual total piling depth quantity might end up being." Milestone's Br. at 6. Therefore, Milestone "prepared an initial bid utilizing the worst-case number given in the estimated quantities table"—4,096 LF. *Id.*

It was at this point that the City issued Addendum 2, providing

> In the event that the specified pile tip elevation is reached and the adequate soil bearing capacity is not yet achieved . . . the contractor shall be paid for additional HP 12x53 bearing pile required at a rate of $60 per lineal foot.

(App.80). In the context of the factual scenario that preceded the issuance of this provision, I believe that Addendum 2 addressed the "predicament" that Milestone described, namely that it was unknown what "the actual piling depth quantity might end up being." *Id.*

That being said, I turn to the law of contracts. It is a court's duty to interpret a contract so as to ascertain the intent of the parties. *First Fed. Sav. Bank of Ind. v. Key* Markets, 559 N.E.2d 600, 603 (Ind. 1990). We must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting. *Id.* In interpreting a written contract, the court will attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. *Id.* When a contract is clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made. *Id.* at 604.

I would find that consistent with the intent of the parties, Addendum 2 provided that in the event the successful bidder had to install more than 4,096 LF of pilings in order to meet the required load bearing

capacity, then the additional quantity would be paid for at the rate of $60 per lineal foot. Therefore, I would reverse the trial court and order that summary judgment be granted to the City.