# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**ALAN S. BROWN**
**JULIA BLACKWELL GELINAS**
**DARREN A. CRAIG**
Frost Brown Todd, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**JON LARAMORE**
**DAVID R. HAMER**
**TERESA A. GRIFFIN**
Faegre Baker Daniels, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| GEORGE DEAN KING, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1202-MF-73 |
| | ) | |
| KAY S. KING, et al., | ) | |
| | ) | |
| Appellees-Plaintiffs. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Theodore M. Sosin, Judge
Cause No. 49D02-0401-MF-140

**January 15, 2013**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellant-Defendant, George Dean King (George), appeals the trial court's findings of fact and conclusions of law approving the Receiver's Verified Final Accounting relating to the receivership of eight business entities founded by George W. King (George Sr.) and the distribution of the receivership assets among George Sr.'s three children, George, Robert King (Bob), and Kay S. King (Kay) (collectively, the Siblings).[1]

We affirm.

ISSUES

George raises four issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by approving the elimination of certain inter-company accounts receivable belonging to Crown Associates, Inc. (Crown) prior to conveying Crown to George;

(2) Whether the trial court properly decided that the Receiver was not required to reimburse World Corporation (World) for tax payments relating to inter-company accounts prior to conveying World to George;

(3) Whether the trial court properly applied the Receiver's approved Plan of Distribution, which required that any beneficiary who unsuccessfully appealed a Receiver's action pursuant to the Plan bears the Receiver's legal costs of the appeal; and

---

[1] We held oral argument in the instant case on October 30, 2012 at the Indiana Court of Appeals Courtroom in Indianapolis, Indiana. We thank and commend the parties for their eloquence and excellent advocacy.

(4) Whether the trial court properly released the Receiver from liability for all actions taken during the pendency of the receivership.

FACTS AND PROCEDURAL HISTORY

This case arises out of a dispute concerning the ownership of several corporations and partnerships between Kay and her minor son, Christopher King (Christopher), on one side and Kay's brothers, George and Bob, on the other side. Throughout his lifetime, George Sr., the Siblings' father, established several companies. In 1949, he founded G.W. King as a for-profit Indiana corporation. He subsequently incorporated R.L. King, Inc. and K.S. King, Inc. as Indiana for-profit corporations in 1963; World as an Indiana for-profit corporation in 1981; and Crown as a Florida corporation in 1989. He also founded three limited partnerships, G.W. King Co., R.L. King Co., and N.E. King, Co. In 1999, Kay lived with George Sr. in his Indianapolis' residence and worked for his investment company. The Siblings had a strained relationship and Kay and George often quarreled over who would control George Sr.'s multimillion dollar estate after his death.

George Sr. died in 2001. A couple of weeks prior to George Sr.'s death, George shot Kay and Christopher multiple times. George was subsequently charged with and convicted of two Counts of attempted murder and is currently

3

serving a fifty-year prison sentence.[2]  *See King v. State*, 799 N.E.2d 42, 46 (Ind. Ct. App. 2003), *trans. denied, cert. denied*, 543 U.S. 817, 125 S.Ct. 54 (2004).

On April 4, 2003, Kay and Christopher filed a Complaint on behalf of themselves, as well as K.S. King Co. and C.K. Co.[3] (collectively, Appellees) against George, Bob, and the five corporations, G.W. King, Inc., K.S. King, Inc., R.L. King, Inc., Crown, and World, and the three partnerships, G.W. King Co., R.L. King, Co., and N.E. King Co. (collectively, the Receivership Entities).  The Complaint alleged thirteen different counts and sought a determination on the ownership of certain Receivership Entities, dissolution of the Receivership Entities, and the appointment of a Receiver to manage the dissolution, winding up and accounting of the Entities.

On June 5, 2003, the trial court appointed John M. Davis as the Receiver and directed him "to immediately recover, receive, take charge and possession of the business, cash, assets, leases, general intangible[s], accounts, proceeds from sales, note[s], bills receivable, and choses in action, and all of the tangible and intangible property and records . . ." of the Receivership Entities.  (Appellant's App. p. 135).   The trial court's order permitted the Receiver to obtain the necessary insurance, open bank accounts, invest assets, determine any taxes owed, and "take such actions as may be necessary and appropriate to prevent the

---

[2] Kay and Christopher obtained a tort judgment against George for the shooting, which was paid in 2008 from George's anticipated share of the receivership assets.
[3] Two King entities, C.K. Co. and K.S. King, Co., an Indiana corporation and a proprietorship respectively, are controlled by Kay.  Although the Receiver considered their assets in his Plan of Distribution, they are not Receivership Entities and are aligned as plaintiffs in the receivership.

dissipation or concealment of any funds or assets." (Appellant's App. pp. 136-37). The order also mandated the Receiver to take custody of the business records of the Receivership Entities, to recommend the disposition of their assets, and allowed him to "initiate legal actions as he deems appropriate in discharging his duties as Receiver." (Appellant's App. pp. 138-39).

The Receiver spent more than five years, well into 2008, marshalling the assets of the Receivership Entities and addressing related tax issues. In 2004, the Receiver filed numerous tax returns for the Receivership Entities and paid more than two million dollars in outstanding tax liabilities. To pay these liabilities, the Receiver drew on Crown's assets as this company had more liquid assets available than the other Receivership Entities. The Receiver accounted for his use of Crown assets to pay the tax obligations owed by other Receivership Entities by crediting an account receivable in favor of Crown with corresponding payables charged to the Receivership or the Receivership Entities. These "intercompany accounts [were] the result of the operation, management, and paying taxes by the [R]eceivership for the affiliated companies." (Transcript p. 51). At the beginning, Crown's accounts receivable was valued at $437,512; in 2007, it stood at $687,278.

On February 22, 2005, the Siblings entered into a Term Sheet for Settlement of Litigation (Term Sheet), which represented their partial agreement on the broad outlines of asset distribution. The Term Sheet constructed a complex distribution scheme in which the allocation of certain specific assets to certain

5

Siblings was contemplated instead of equally dividing the receivership assets among the Siblings. For example, the Term Sheet provided that

> The assets and/or equity interest of [Crown] shall be conveyed by the Receiver to [George], free and clear of any claims that were asserted or could have been asserted by any plaintiffs or any defendants in the King Receivership Litigation, subject only to claims for any unpaid taxes and the claims of third-party creditors of [Crown].

(Appellant's App. p. 363). It also gave George a condominium in the Geist neighborhood of Marion County, a lakefront lot in the same area, and three automobiles. Because not all issues over the division of receivership assets were resolved in the Term Sheet, it also specified that the Siblings' further agreements would be set forth in greater detail in a separate Liquidation Agreement and that any distributions to the Siblings would be expedited through a liquidating trust. In the event of continuing disagreement between the Siblings, the Term Sheet provided

> Until dismissal of the King Receivership Litigation, the Receivership Court shall retain jurisdiction to enforce the terms of the Term Sheet and the Liquidation Agreement. If counsel for the King Family are unable to agree upon any term or condition of the Liquidation Agreement following execution of this Term Sheet, the parties agree that such dispute may be submitted by any other party to the Receivership Court for determination and the determination of the Receivership Court shall be final and non-appealable.

(Appellant's App. pp. 369-70).

The Siblings failed to enter into the Liquidation Agreement; instead, each Sibling presented his or her own draft liquidation agreement to the trial court. On February 24, 2006, the trial court issued its Entry Resolving Disputes Between

6

Plaintiffs and Defendants Concerning Settlement of Litigation, which decided two issues raised by the Siblings. With respect to the accounts receivable created by the Receiver and now claimed by George, the trial court concluded that "the Receiver should eliminate all inter-company accounts prior to making the transfers contemplated by the Term Sheet and that a definitive Settlement Agreement should be executed by the parties in accordance with these findings of the [c]ourt." (Appellant's App. p. 70). Regarding George's request to retain stock in the Receivership Entities by having Bob and Kay transfer their shares in the Receivership Entities to him in exchange for the shares' monetary value, the trial court concluded, in pertinent part

> 42. [] that the tax deferral mechanism which [George] seeks to have imposed under the Term Sheet, given his prior history of tax fraud and asset concealment, places an unacceptable risk upon the other King siblings, particularly should [George] liquidate the assets of the corporations and place himself in a position where he is unable to pay whatever subsequent tax liabilities might be claims against those entities. Accordingly, the Settlement Agreement should not be modified to provide for acquisition of stock in the [Receivership Entities] by [George].

(Appellant's App. p. 75).

Again, the Siblings were unable to reach an agreement to divide the assets. Consequently, on November 25, 2008, the Receiver submitted his Plan of Distribution for the trial court's approval. In his Plan, the Receiver acknowledged that he intended to follow the Term Sheet "to the greatest extent practicable under the circumstances" and to the extent its provisions remained relevant. (Appellant's App. p. 343). He proposed the elimination of the accounts receivable

7

held by Crown prior to its conveyance to George and recommended to eliminate the liquidating agent contemplated by the Term Sheet and instead allow him to manage, liquidate, and distribute the assets. The Plan further suggested to distribute certain specified receivership assets to certain Siblings, in general accord with the Term Sheet along with an equal division of the remaining assets. The Plan of Distribution also contemplated that

> In the event that any of the King Children protest or dispute any of Receiver's actions taken pursuant to this Plan, once approved, by means of litigation, or otherwise, and Receiver thereafter substantially prevails with respect to such protest or dispute, the unsuccessful disputant shall be obligated to pay all of Receiver's legal fees and related costs incurred with respect to such protest or dispute, which amounts shall be charged against that disputant's Distributive Share[.]

(Appellant's App. p. 361).

On November 25, 2008, the trial court approved the Receiver's Plan of Distribution, concluding that "[f]ollowing entry of a final Order of approval of the Plan, George, Bob, and Kay, as distributees, shall be entitled, and are hereby authorized, to receive distribution and all corresponding ownership rights to all of the Distribution Assets, as more appropriately detailed and described in the Plan." (Appellant's App. p. 395). Following the court's entry, George appealed the trial court's approval of the Receiver's Plan of Distribution. However, due to substantive procedural deficiencies, we dismissed the appeal. *See King v. King*, 924 N.E.2d 227 (Ind. Ct. App. 2010) (unpublished disposition).

8

On October 4, 2011, the Receiver filed his Verified Final Accounting and Motions, which requested implementation of the approved and updated Plan of Distribution. On November 3, 2011, George objected claiming that the Plan of Distribution (1) failed to restore assets to Crown; (2) failed to restore tax payments to World; (3) apportioned to George 100% of the Receiver's legal costs defending the appeal; and (4) released the Receiver from claims George "believes he may have" with respect to certain trades that occurred in Crown's investment account which was administered by the investment firm of Young Stovall. (Appellant's App. p. 433). Overruling George's objections, the trial court approved the Receiver's Final Accounting and Plan on January 5, 2012.

George now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

In the instant case, the trial court entered findings of fact and conclusions of law. Therefore, our standard of review is two-tiered: we first determine whether the evidence supports the trial court's findings, and second, we determine whether the findings support the judgment. *Briles v. Wausau Ins. Co.*, 858 N.E.2d 208, 212 (Ind. Ct. App. 2006). Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them, and the trial court's judgment is clearly erroneous if it is unsupported by the findings and the conclusions which rely upon those findings. *Id.* In establishing whether the

9

findings or the judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id.*

While conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and must affirm the trial court's decision if the record contains any supporting evidence or inferences. *Id.* However, while we defer substantially to findings of fact, we do not do so for conclusions of law. *Id.* We evaluate conclusions of law *de novo* and owe no deference to a trial court's determination of such questions. *Id.*

## II. *Crown's Accounts Receivable*

George's first and most important concern is the trial court's elimination of Crown's accounts receivable booking. Referencing paragraph 1 of the Term Sheet, which provides that the assets and/or equity interest of Crown will be conveyed to George, George asserts that this not only includes the shares of the corporation but also the accounts receivable which were eliminated by the trial court's order of November 25, 2008 and which amounted to $687,278 by 2007.

In support of his argument, George relies heavily on the timing of the execution of the Term Sheet. Alluding to the fact that the accounts receivable were in existence from 2004 until the trial court's elimination by its Order of November 25, 2008, George asserts that the Term Sheet was agreed upon by the Siblings and executed on February 22, 2005—when the accounts receivable were still on the books. As such, the Siblings must have consented to the conveyance of not only Crown but also of its accounts receivable. We disagree.

10

The receiver is an officer of the court, and comes within the court's sole direction as soon as he is appointed and has qualified; "parties have no authority over him." *Brock v. Rudug*, 119 N.E. 491, 492 (Ind. Ct. App. 1918). Also, as soon as a receiver is appointed and qualified, the assets become receivership assets until final distribution by court order. *See Lecompte v. Wilson*, 15 N.E.2d 97, 100 (Ind. 1938). Therefore, the Receiver's Plan of Distribution governs the division of assets—not the Term Sheet—as only the Plan was adopted by the trial court.

The evidence reflects that at the outset of the receivership, the Receiver proposed that all Receivership Entities would be liquidated with the proceeds divided equally between the Siblings.[4] To that end, the Receiver began booking inter-company accounts to document the use of assets from one entity to pay the obligations owed by other Receivership Entities. The Receiver drew on Crown's assets because the company had more liquid assets available than the other Receivership Entities. The Receiver accounted for this use of Crown assets by crediting an account receivable in favor of Crown with corresponding payables charged to the Receivership or the Receivership Entities. In this scenario, the accounts receivable coupled with the accounts payable amounted to a zero net balance.

However, the Receivership's ultimate goal was altered after the Siblings executed the Term Sheet—a private agreement between the Siblings, to which the

---

[4] At the onset of his receivership, it became clear to the Receiver that the Receivership Entities were merely holding companies for investments, with their predominant holding marketable securities. These assets were seemingly arbitrarily apportioned to the various Receivership Entities and George Sr. moved the assets around without any documented underlying financial transaction justifying the transfer of assets.

11

trial court, who governed the Receivership Entities at the time, was not a party. Once the Term Sheet was executed and the Siblings had agreed to convey Crown to George and to transfer certain assets to certain Siblings, the assets included within each Receivership Entity became important. Specifically with respect to Crown, the Term Sheet provided that

> The assets and/or equity interest of [Crown] shall be conveyed by the Receiver to [George], free and clear of any claims that were asserted or could have been asserted by any plaintiffs or any defendants in the King Receivership Litigation, subject only to claims for any unpaid taxes and the claims of third-party creditors of [Crown].

(Appellant's App. p. 363).

On February 24, 2006, the trial court ordered the elimination of all inter-company accounts prior to making transfers contemplated by the Term Sheet. Because the Siblings were unable to agree on a final Settlement Agreement, the Receiver developed and submitted for the trial court's approval two detailed Plans of Distribution. In both Plans, the Receiver followed the Term Sheet "to the greatest extent practicable under the circumstances" (Appellant's App. p. 343). He proposed the elimination of the accounts receivable held by Crown prior to its conveyance to George and suggested certain specified receivership assets be distributed to certain Siblings. Both of the Receiver's Plans were approved by the trial court.

Moreover, the Term Sheet itself fails to address Crown's accounts receivable. Generally, in ascertaining the contract's clarity, or lack thereof, we

12

consider the whole document, not just the disputed language. *City of Lawrenceburg v. Milestone Contractors, L.P*., 809 N.E.2d 879, 883 (Ind. Ct. App. 2004), *trans. denied*. Construction of contract language that would render any words, phrases, or terms ineffective or meaningless should be avoided. *Id*. Courts should presume that all provisions included in a contract are there for a purpose and, if possible, reconcile seemingly conflicting provisions to give effect to all provisions. *Id*. Furthermore, in its interpretation of the contract, the court should attempt to determine the parties' intent when entering a contract from their expression within the four corners of the written instrument. *Id*.

The Term Sheet divided a multitude of assets between the Siblings, ranging from real estate, safety deposit boxes, and personal property down to particular comic books. With respect to Crown, the Term Sheet merely states

> The assets and/or equity interest of [Crown] shall be conveyed by the Receiver to [George], *free and clear of any claims that were asserted or could have been asserted by any plaintiffs or any defendants in the King Receivership Litigation*, subject only to claims for any unpaid taxes and the claims of third-party creditors of [Crown].

(Appellant's App. p. 363) (emphasis added). Given the level of detail embodied in the Term Sheet, the absence of a clear expression by the parties to repay the accounts receivable which had been expressly created by the Receiver during the Receivership and which existed during the execution of the Term Sheet, is evidence of intent that no such offset was bargained for. Moreover, as pointed out by the trial court, and we agree, it appears that the Term Sheet's language rejects

13

George's argument. Specifically, the Term Sheet establishes that Crown has to be conveyed free and clear of claims that can be asserted by any plaintiff or defendant. The account receivable is a claim asserted by George in the Receivership litigation and thus cannot be part of Crown's conveyance. In sum we cannot say that the trial court abused its discretion by ordering the Receiver to eliminate Crown's accounts receivable prior to the company's conveyance to George.

III. *Reimbursement of World's Tax Payments*

In a related argument, George claims that the trial court erred by failing to reimburse World for the tax burden it suffered as a result of the Receiver's accounting decisions.

William Clark (Clark), the Receiver's accountant, testified that upon the commencement of the Receivership, they discovered very poor accounting records documenting purported asset transfers—and in some instances, no records at all. "Early on," the records showed World making transfers to the other Receivership Entities. (Tr. p. 185). Clark explained

> At that point in time, we assumed that these were advances to the other entities, loans to them. But in hindsight, we became aware of the fact that, [], it could just as well be repayments of prior loans. We didn't know [] whether we saw the front of the transaction or the end of the transaction, but we, we began with the assumption that this was a loan from [World] to the other entities, and each year, we did a calculation of the imputed interest, the interest that should, that would have been owned, had these been legitimate loans to these entities. This was a time consuming process. We had to impute the interest income to World, we had to impute the interest expense for [] K.S. King [], so, we began a calculation, a dual calculation on this.

14

. . . We did that for a couple of years. . . . [W]e came to the conclusion that maybe our assumption that it was a loan could have been wrong, so we ceased doing that, because of the time constraints, and also because we were under the impression this was going to be a one third, one third, one third split, anyways, so, what difference did it make if K.S. King got a tax break and [World] got a tax [] bill[.]

(Tr. p. 186).

Similarly to Crown, George now asserts a right to the taxes World paid on these loans. Having paid $62,599.32 in state and federal income tax liabilities "it did not owe," and the other Receivership Entities receiving a benefit, George requests this amount be restored to World. (Appellant's Br. p. 17).

As with Crown, the Receiver's Plan of Distribution governs the conveyance of assets to the Siblings. During the term of the Receivership, the assets are considered receivership assets until final distribution by court order. *See Lecompte*, 15 N.E.2d at 100. The Plan of Distribution, adopted by the trial court, directed the Receiver to "convey by quitclaim bill of sale all shares and/or equity interests in [World] to George." (Appellant's App. p. 354). As such, George is only entitled to the shares of World as they existed at the time of the conveyance, not to any specific assets or funds. Moreover, George fails to show he was harmed by the trial court's decision not to restore the tax payments. To the contrary, the evidence reflects that the tax payment by World was offset by a corresponding tax benefit to K.S. King, Inc., which George also received under the Plan of Distribution. Therefore, we conclude that the trial court did not abuse its discretion in declining George's request.

15

## IV. *Receiver's Appellate Fees*

Next, George takes issue with the trial court's decision to charge him with the Receiver's legal expenses of the prior appeal which was dismissed based on George's failure to comply with the appellate procedural rules.

When the Siblings were unable to reach an agreement based on the premises of the Term Sheet, the Receiver submitted his Plan of Distribution for the trial court's approval on November 25, 2008. In his Plan, the Receiver acknowledged that he intended to follow the Term Sheet "to the greatest extent practicable under the circumstances" and to the extent its provisions remained relevant. (Appellant's App. p. 343). The Plan of Distribution also contemplated that

> In the event that any of the King Children protest or dispute any to Receiver's actions taken pursuant to this Plan, once approved, by means of litigation, or otherwise, and Receiver thereafter substantially prevails with respect to such protest or dispute, the unsuccessful disputant shall be obligated to pay all of Receiver's legal fees and related costs incurred with respect to such protest or dispute, which amounts shall be charged against that disputant's Distributive Share[.]

(Appellant's App. p. 361).

On November 25, 2008, the trial court approved the Receiver's Plan of Distribution, and subsequent to the approval, George appealed. We dismissed his appeal due to his failure to comply with procedural rules. *See* our memorandum opinion in *King v. King*, 924 N.E.2d 227 (Ind. Ct. App. 2010). At the request of the Receiver, the trial court allocated to George's distributive share the Receiver's

16

legal expenses in the amount of $77,422 for defending the prior appeal when it approved Receiver's Final Accounting and Plan on January 5, 2012.

George now finds this allocation to be unreasonable. First, referencing Indiana case law which premises that a receiver should be impartial and disinterested, George claims that it was inappropriate for the Receiver to expend receivership funds to oppose his appeal to the trial court's decision to eliminate the accounts receivable. While George and Bob took the position that these accounts should be awarded to Crown, Kay opposed it. According to George, by aligning his position with Kay, the Receiver took an inappropriate position by defending "the position of one sibling over the others." (Appellant's Br. p. 18). We disagree.

> Ind. Code § 23-1-47-3 provides, in pertinent part, that
>
> The court shall describe the powers and duties of the receiver or custodian in its appointing order, which may be amended from time to time. Among other powers:
> (1) the receiver:
>> (A) may dispose of all or any part of the assets of the corporation wherever located, at a public or private sale, if authorized by the court; and
>> (B) may sue and defend in the receiver's own name as receiver of the corporation in all courts of this state[.]

This statutory provision was also included in the trial court's order appointing the Receiver, allowing him to "initiate legal actions as he deems appropriate in discharging his duties as Receiver." (Appellant's App. pp. 138-39).

Thus, having a duty to defend against George's appeal, the Receiver participated not to favor one beneficiary over another but rather to preserve

receivership assets and to defend the approved Plan of Distribution. If the Receiver's Plan had been reversed on appeal, more than nine years of work would have to be redone, including the re-creation of pre-receivership accounts to ensure that the each of the Siblings would receive what he or she is entitled to.

Second, George disputes the allocation because his appeal was not decided on the merits. While George is correct that his appeal was not decided on the merits, but rather dismissed, we remind George that pursuant to the language of the Plan of Distribution the allocation of legal fees is not dependent on the relative success of a decision on the merits but rather on being unsuccessful in a "protest" or "dispute" to any of the Receiver's actions. By having his claim dismissed, we conclude that George was unsuccessful in his dispute and the cost of the Receiver's legal fees was properly allocated to him.

## V. *Release of the Receiver*

As a final issue, George contends that the trial court should not have released the Receiver from liability. George accuses the brokerage firm of Young Stovall of improper and unauthorized trades at the direction of the Receiver with respect to Crown's account. Prior to the appointment of the Receiver, Crown's investments were managed by Young Stovall and its assets were kept in debt instruments. After the appointment of the Receiver, the Crown account suffered "huge losses." (Tr. p. 224). During the pendency of the receivership, George attempted to pursue claims in arbitration against Young Stovall seeking compensation for the losses Crown had suffered. However, the record reflects that

18

the Receiver notified the arbitrator that George lacked standing to pursue the arbitration because he was not the owner of Crown and the arbitration was subsequently dismissed. In its final judgment, the trial court granted George a limited Power of Attorney to pursue the arbitration, but at the same time, the trial court also provided a complete release to the Receiver thereby making it impossible for George to obtain any relief against the Receiver for actions related to trading on the Young Stovall account. Referencing a receiver's fiduciary duty to protect and preserve the assets of the receivership, George contends that the trial court abused its discretion in releasing the Receiver from liability with respect to perceived mishandling of the Crown investments.

In support of his argument that the Crown brokerage account suffered "huge losses" during the receivership, George relies on his own testimony. Most notably, responding to his counsel's question "what information do you have that [the Receiver] did something inappropriate as Receiver[?]" George replied:

> We don't yet. We haven't been able to get the Young Stovall records. [The Receiver] has blocked that. It's extremely peculiar to me, though, why he would come in and block that, instead of letting us get the information, and proceeding down there on that suit, if it was Young Stovall's fault. Now I'm beginning to wonder who's fault it is. Somebody had to give those orders. Stocks aren't just traded and purchased unless there's an order from somebody.

(Tr. p. 228). In defending his position with respect to the Crown assets and Young Stovall's actions, the Receiver testified:

> Crown, through Lee Bryant [the investment broker], has had a relationship with the brokerage firm of Young Stovall. I believe that Mr. Bryant has served us well. I rarely hear from him, and when I

19

do, I follow his advice [] and to the extent that losses were taken, that's unfortunate. But overall, Crown investments are up considerably. There's not a cumulative net loss. Crown, I think has been invested pretty prudently. I don't hold myself out to be an investment advisor. [George] knows that. So I do follow, [], I either leaved [sic] the money the way it was committed when we found the case, or in the event of mature investments, followed the direction of the broker, wherever the money is held.

(Tr. p. 233).

Lacking any concrete evidence to accuse the Receiver of mishandling the account, George's claims are entirely speculative and based on conjecture. *See Colen v. Pride Vending Service*, 654 N.E.2d 1159, 1163 (Ind. Ct. App. 1995) (Testimony based on conjecture or speculation is insufficient to support a claim.) Therefore, the trial court properly rejected George's request to deny the Receiver's release from liability.

## CONCLUSION

Based on the foregoing, we conclude that (1) the trial court did not abuse its discretion when it approved the elimination of certain inter-company accounts receivable belonging to Crown prior to conveying Crown to George; (2) the trial court properly decided that the Receiver was not required to reimburse World for tax payments relating to inter-company accounts prior to conveying World to George; (3) the trial court did not abuse its discretion by allocating the Receiver's legal costs to George after George's unsuccessful prior appeal; and (4) the trial court properly released the Receiver from liability for all his actions during the pendency of the receivership.

20

Affirmed.

BAILEY, J. concurs

CRONE, J. concurs in result